292 F.2d 794
 PARMELEE TRANSPORTATION COMPANY, a Delaware corporation, Plaintiff-Appellant,
v.
John L. KEESHIN, Railroad Transfer Service, Inc., Hugh W. Cross, the New York Central Railroad Company, Howard E. Simpson, Paul E. Feucht, Wayne A. Johnston, Fred G. Gurley, the Atchison, Topeka and Santa Fe Railway Company, the Baltimore and Ohio Railroad Company, Chicago & Northwestern Railway Company, Illinois Central Railroad Company and the Pennsylvania Railroad Company, Defendants-Appellees.
 No. 13160.
 United States Court of Appeals Seventh Circuit.
 June 30, 1961.
 
 Thomas C. McConnell, Lee A. Freeman, Chicago, Ill., Herbert B. Lazarus, New York City, Francis J. McConnell, John Borst, Jr., John Paul Stevens, Chicago, Ill., for plaintiff-appellant.
 Albert E. Jenner, Jr., Philip W. Tone, Chicago, Ill., Thompson, Raymond, Mayer, Jenner & Bloomstein, Chicago, Ill., of counsel, for certain appellee Railroads and for appellee Railroad Presidents.
 Marvin A. Jersild, Martin J. Keating, Chicago, Ill., for appellee, New York Cent. R. Co.
 Albert J. Meserow, Amos M. Mathews, Chicago, Ill., for appellees John L. Keeshin and Railroad Transfer Service, Inc.
 Joseph C. Owens, Chicago, Ill., for appellee Hugh W. Cross.
 Before DUFFY, SCHNACKENBERG and CASTLE, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 Parmelee Transportation Company, a Delaware corporation, plaintiff, has appealed from a judgment of the district court in favor of John L. Keeshin, Railroad Transfer Service, Inc., Hugh W. Cross, the New York Central Railroad Company, Howard E. Simpson, Paul E. Feucht, Wayne A. Johnston, Fred G. Gurley, the Atchison, Topeka and Santa Fe Railway Company, the Baltimore and Ohio Railroad Company, Chicago & Northwestern Railway Company, Illinois Central Railroad Company and the Pennsylvania Railroad Company, defendants. Plaintiff's complaint filed February 16, 1956 alleges a combination and conspiracy in restraint of trade in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2), and prays for treble damages and injunctive relief. The judgment bases a dismissal of the action on, first, a jury's verdict that the public has not been injured, and, second, on the alternative ground that plaintiff failed to establish a violation of § 1 or § 2 of the Sherman Act or any other provision of the antitrust laws and did not state a claim thereunder.[1]
 
 
 2
 Plaintiff, prior to September 30, 1955, was engaged in the business of transferring passengers and their baggage between railroad terminal stations in Chicago and the pickup and delivery of baggage within the Chicago metropolitan area to and from railroad stations.[2]
 
 
 3
 The defendants are (a) John L. Keeshin, and his company, Railroad Transfer Service, Inc., herein called Transfer, (b) Hugh W. Cross, former chairman of the Interstate Commerce Commission, and (c) six railroads, constituting a committee chosen by twenty-one railroads having passenger terminals in Chicago and the presidents of four of these six railroads.[3]
 
 
 4
 The complaint alleges the matters referred to in the following two paragraphs.
 
 
 5
 Since prior to March 15, 1955, the defendants have been engaged in a conspiracy to eliminate all competition for contracts or arrangements with the Chicago railroads for the rendition of Chicago station transfer service and baggage pickup and delivery service.
 
 
 6
 Contrary to his public obligations and acting on behalf of Keeshin, Cross induced the defendant railroad presidents and defendant railroads to foreclose any competition for the transfer business, and to cause the twenty-one railroads comprising the entire market for such services to do business exclusively with a new company to be formed by Keeshin, regardless of whether the cost and terms proposed by Keeshin were less favorable than could be obtained as a result of free competition. Keeshin secured Cross' improper intervention by promises of a valuable consideration. Cross was able to induce the railroads to join the conspiracy by using his position as a member of the Interstate Commerce Commission. The railroads accepted the proposal in order to influence Cross to give favorable consideration to important railroad matters pending before the Commission. As a result, the railroads entered into an exclusive five-year contract with Transfer. The contract, by its terms, foreclosed competition for the Chicago transfer business.
 
 
 7
 Soon after the suit was commenced, certain defendants filed a motion to dismiss, on the ground that the complaint failed to state a claim upon which relief could be granted and specifically, that there were not sufficient facts alleged to establish public injury. The late Judge Philip L. Sullivan overruled the motions, and defendants filed answers.
 
 
 8
 Upon the reassignment of the case to Judge Miner, an order was entered separating the issue of public injury for trial, over the objections of both sides.
 
 
 9
 After the case proceeded to trial, plaintiff's counsel made offers of proof of conspiracy "under our complaint", because, he explained, he believed it necessary in case of an appeal. Subsequently the court permitted these offers of proof to be made but eventually the offers were, according to plaintiff's brief, "stricken from the record by the court."
 
 
 10
 At the close of plaintiff's case, Judge Miner held that, even if there was a verdict of public injury, "this case does not belong in the family of anti-trust cases under any conditions, from the entire record before me."[4] He made it clear that he was disposing of the case upon the allegations of the complaint and all evidence offered by plaintiff and received upon the trial, as well as the facts stated in all offers of proof made by plaintiff, regardless of whether he had ruled adversely to any of said offers. He announced that, viewing said evidence and offers of proof in the light most favorable to plaintiff, and making all reasonable inferences therefrom in its favor, he determined that plaintiff had failed to establish a violation of § 1 or § 2 of the Sherman Act or of any other provisions of the antitrust laws, and that the complaint, as amended, relating to issues other than that of the verdict of the jury, "do not state a claim upon which relief can be granted under Section 1 or Section 2 of the Sherman Act, or any other provision of the antitrust laws; * * *."
 
 
 11
 The judgment from which appeal has been taken was for defendants on the verdict, ordered and adjudged that plaintiff take nothing by its action, and ordered and decreed that the complaint, as amended, insofar as it sounded in equity, be dismissed for want of equity and judgment be entered for defendants on the equitable issues.
 
 
 12
 1. Plaintiff contends that Judge Miner erred in overruling Judge Sullivan's decision, D.C., 144 F.Supp. 480, denying defendants' motion to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted. Plaintiff's counsel speak of Judge Sullivan's opinion as "the law of the case". A reference to that opinion which was filed in 1956 makes it clear that Judge Sullivan considered only the "complaint on its face". The action of Judge Miner was the entry of a summary judgment and involved not merely the complaint[5] which was before Judge Sullivan, but also offers of proof and evidence submitted only to Judge Miner.
 
 
 13
 Regardless of the impact of any law-of-the-case rule, our duty is to determine whether the judgment of Judge Miner is correct. In fact, we should sustain any judgment from which an appeal has been taken if it is supported by the record and the law, regardless of whether the lower court has ruled erroneously or has ruled at all on that ground. Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314. Obviously we cannot be expected to reverse a correct decision by one district judge simply because we find that it is contrary to a prior ruling by another district judge in the same case, i. e. contrary to the "law of the case".
 
 
 14
 2. This judgment, being based upon the complaint and plaintiff's offered evidence, did not involve a finding of any genuine issue as to any material fact. It is a summary judgment. Rule 56(b) and (c), 28 U.S.C.A. Each answer filed by the defendants asks for dismissal of the complaint. In Repsold v. New York Life Insurance Company, 7 Cir., 216 F.2d 479, 483, we said:
 
 
 15
 "The court is authorized under the plain provisions of this rule to summarily determine whether or not a bona fide issue of fact exists between the parties to the action. A determination by the court that such issue is presented makes the rule inoperative. On the other hand, if the pleadings, and proof in the form of depositions, affidavits and admissions on file, disclose that no real cause of action or defense exists, the court may determine that there is no issue to be tried by a jury and may grant a summary judgment.
 
 
 16
 "Rule 56 does not provide any method for exactly determining the presence of an issue of fact, and so each case depends upon the facts peculiar to it. Speaking in general terms, the court is not authorized under the rule to try issues of fact but it has the power to penetrate the allegations of fact in the pleadings and look to any evidential source to determine whether there is an issue of fact to be tried."
 
 
 17
 3. Plaintiff's complaint alleges that it was ready, willing and able, and had offered to continue to engage in the station transfer and pickup and delivery business on terms and conditions favorable to the railroads and to the traveling public, but had been prevented from so doing from and after September 30, 1955 by the conspiracy described. It also alleges that the
 
 
 18
 "* * * services performed by Transfer pursuant to said contract have been and are more costly to said railroads and less extensive and valuable than the services previously performed by plaintiff and which plaintiff had offered to continue to perform."
 
 
 19
 We are assisted by plaintiff's brief in the following statement of offers of proof which the record shows were made by plaintiff before Judge Miner:[6]
 
 
 20
 Plaintiff had rendered satisfactory service to the railroads in Chicago over a period of many years. In 1954, a committee of six railroads (representing each of the six railroad terminals) was appointed by the twenty-one railroads terminating in Chicago, to interview other prospective transfer carriers to see whether the cost to the railroads of providing the station transfer services could be reduced. The memorandum prepared by the committee and submitted to prospective contractors stressed that the cost of service was the committee's only concern in these words:
 
 
 21
 "We would have it known that the railroads serving Chicago have enjoyed their relationship with the Parmelee Transportation Company, and they feel that the services of each has contributed to the success of the other, notwithstanding the economic conditions are such that the railroads must not undertake to pay a greater fee for the services performed than is necessary, and because the greater portion of the transfer fee paid to the Parmelee Transportation Company is absorbed by the outbound railroad. * * *"
 
 
 22
 Negotiations were conducted over a period of months and the committee concluded that the proposals received, including one from Keeshin, were unsatisfactory and no change from plaintiff was warranted unless the transfer rate was cut 10¢ to 20¢ per coupon from $1.20. The committee report was presented to all of the twenty-one terminal railroads on February 1, 1955, and it was the consensus of opinion that there should be no change from plaintiff. The Santa Fe Railroad representative reported:
 
 
 23
 "* * * Chicago Terminal Lines were advised that we had received one bid for transfer of passengers and baggage from Keeshin at approximately same rate Parmelee is now charging, and one bid for transfer of baggage only. Chairman Padrick advised lines present that it was the view of the committee studying the transfer arrangements that a change in operators should not be considered unless, say, bid of $1.10 or $1.00 including baggage was submitted by some transfer company."
 
 The Soo Line representative stated:
 
 24
 "* * * The Railway Express Agency made the statement that we were getting a good deal at present and that they would not touch the proposition for anything less than cost plus 15 percent.
 
 
 25
 "The consensus of the meeting seemed to be there would be no point in disturbing the present relationship unless we could reduce the price to around $1.00 or $1.10."
 
 The B & O Railroad said:
 
 26
 "J. L. Keeshin's proposal not sufficient decrease from present cost to warrant change from Parmelee Co. Railroads worse off if must load and unload trailers."
 
 
 27
 Plaintiff was then contacted and submitted its proposal of March 15, 1955, which undertook to provide $500,000 of new equipment, reduce the coupon rate from $1.22 to $1.20 and provide for wage and traffic escalator clauses. This proposal was well received. One of the Vice Presidents of the New York Central (the largest transfer railroad, accounting for over 22.9% of the traffic) wrote plaintiff on March 24, 1955, and stated:
 
 
 28
 "I have read your proposal of March 15th addressed to Mr. Padrick, concerning the transfer service performed by Parmelee Transportation Company at Chicago.
 
 
 29
 "I see no reason why it should not be adopted by the Chicago terminal lines, as it impresses me as being fair and reasonable."
 
 
 30
 The committee considered plaintiff's proposal on March 17, 1955, and undertook to reach its decision within thirty days. The interviews were concluded.
 
 
 31
 Keeshin late in March, 1955, had a meeting with Interstate Commerce Commissioner Hugh W. Cross in Washington, D. C. Keeshin asked Cross to put in a good word for him with the railroads with whom he was negotiating. This Cross did. Cross reported to Keeshin on his talks with the railroad executives and when Keeshin was awarded the transfer contract Keeshin called Cross to thank him for the help rendered.
 
 
 32
 There were thirty-four long distance telephone calls between them during the period from March 23 to September 18, 1955. The calls were usually made late at night and were most frequently of long duration — some exceeded forty-five to sixty minutes in length. Cross admitted that he had many telephone conversations with Keeshin concerning the transfer negotiations.
 
 
 33
 In April 1955, Cross visited President Simpson of the B & O in his office in Baltimore and called him on the long distance telephone on several occasions and in each instance discussed the Chicago transfer negotiations. Cross likewise visited Carpi, Vice President of the Pennsylvania, in his office in Philadelphia and called him on the long distance telephone on several occasions, usually coinciding with the Simpson calls and discussed the transfer matter with Carpi.
 
 
 34
 News of these contacts quickly spread to the committee members. On April 27, 1955, President Perlman of the New York Central spoke to his Chicago Vice President and requested that the committee not act on the transfer contract award until Perlman "would have an opportunity to analyze it." The chairman of the committee, Bone, Chicago passenger agent of N.Y.C., wanted to know from his superior what position he should take "in view of the analysis of Perlman."
 
 
 35
 On April 28, 1955, Bone called Smart of the Illinois Central and informed him that "some railroad presidents have been contacted"; that he was calling a committee meeting for May 19 and "that in view of contacts now being made of the presidents' offices that representation at this meeting should be at the highest passenger traffic level * * *."
 
 
 36
 On April 29, 1955, the day after the Bone-Smart conversation, President Johnston of the I.C., Smart's superior, went to Washington, D. C., met with Cross and asked him if it was true that he was going to go with Keeshin in an executive capacity if Keeshin secured the transfer contract. Cross said the story was true.
 
 
 37
 President Gurley of the Santa Fe also stated in affidavit and in testimony that he heard statements prior to June, 1955, possibly from a railroad man in Washington, that Cross would be associated with Keshin if the latter secured the transfer contract. In fact, Keeshin conceded that he had a general understanding with Cross which was in existence at the time of the transfer negotiations that Cross could have a position with him when he left the government.
 
 
 38
 Cross for personal reasons had intervened with the top railroad executives and sought to have the transfer services awarded to Keeshin irrespective of competitive considerations. The committee railroad executives knew of Cross' personal interest in securing an executive post with Keeshin if he got the transfer contract. They were also fully aware that matters of great importance to them were pending before the Interstate Commerce Commission and that Cross would continue to vote in the decision of these cases while he was on the Commission.
 
 
 39
 Furthermore, Cross had private conversations with these railroad executives concerning specific cases pending before the Commission. Thus, when he visited Simpson in Baltimore and asked him about the Chicago transfer negotiations he also discussed the pending B & O bond financing. This was the largest security refinancing undertaken by any railroad. It resulted in interest savings to the B & O of $3,000,000 per year. The B & O had many substantial reasons for securing Cross' cooperation on this refinancing.
 
 
 40
 In view of Cross' intervention (and President Perlman's expressed interest) another negotiating meeting was set by the committee chairman, Bone, of the N.Y.C., for May 19, 1955, at which Keeshin and plaintiff would again be heard. Cross had several long distance telephone conversations with Keeshin and then on May 12 and 13 he called President Simpson, B & O, Vice President Carpi, Pennsylvania, and President Feucht, C.N.W. Feucht prepared a memo of this conversation which read in part:
 
 
 41
 "Memorandum of my conversation with Hugh Cross, Commissioner, Interstate Commerce Commission, at 4:15 P.M. Friday, May 13, 1955
 
 
 42
 "Hugh Cross stated that he was very much interested in seeing that J. L. Keeshin got the new contract with the railroads here in Chicago to handle baggage and people between the various stations. He understands the contract expires July 1st and there are three bids for the new contract — Willett, Parmelee and Keeshin."
 
 
 43
 Feucht testified that in the course of this conversation Cross asked him whether he needed a raise in commutation fares but Feucht replied that he had just had one.
 
 
 44
 The committee met on May 19, 1955 and had in attendance the top passenger executives of the B & O from Baltimore, of the Pennsylvania from Philadelphia and of the I.C. and C.N.W. This was the first time any of these executives had attended such a meeting. At the meeting Keeshin adhered to his original proposal submitted in December 1954. Plaintiff amplified on its March 1955 proposal by withdrawing the traffic escalator clause and submitting maximum coupon rates for the next six years of $1.20, $1.22, $1.23 and $1.24 for the first four years and $1.25 for the remaining two years. The schedule of maximum rates was transmitted to the committee chairman the next day with the notation.
 
 
 45
 "To date, Parmelee has served the railroads for 102 years with no written contract, only the railroads' verbal commitment. We are still ready to honor the verbal commitment of the railroads for the next five years as per our understanding, without a written contract unless the railroads desire to have such a contract."
 
 
 46
 The committee recessed to June 3 in order to secure the views of their executives. Immediately, memoranda recommendations were prepared by the participating committee members for submission to their superiors. Plaintiff found memos in the files of each of the three western railroads on the committee. All recommended the selection of plaintiff because its proposal was superior.
 
 
 47
 The Santa Fe representative on May 23 recommended plaintiff stating in part:
 
 
 48
 "There will be a final meeting of the committee on June 3rd to submit a recommendation to all Chicago Terminal Lines. We propose to recommend the continuance of our arrangement with Parmelee because of our long association with that company and its satisfactory transfer of our passengers and baggage between terminals. We believe that the proposal submitted by Mr. Markin is superior to the proposal submitted by Mr. Keeshin because we have assurance of a maximum coupon rate in the fourth and fifth years, and in addition, we will avoid the possibility of labor trouble in connection with operation by a new company with different union."
 
 
 49
 "We understand that Mr. Keeshin has appealed to the executives of the B&O, Penna., C & NW, and possibly other lines for favorable consideration of his bid."
 
 
 50
 The CNW committee representative on May 23 addressed a memo to his Vice President recommending plaintiff, and the Vice President in turn passed the recommendation up to his President with these words:
 
 
 51
 "It is the view of our passenger people, and I understand the same view is held by the committee members from the other railroads, that Parmelee should be awarded the contract because of their years of experience, their financial integrity and the fact that they have given us a definite maximum of $1.25 per coupon after the fourth year of the contract."
 
 
 52
 The Illinois Central recommended plaintiff:
 
 
 53
 "In view of the fact that both of these proposals are about the same and as no serious complaints have been received in connection with the present Parmelee service, it is my recommendation that we record our expression as favoring the continuation of the Parmelee Service. May I have your approval."
 
 
 54
 These reports favorable to the selection of plaintiff came after the May 19 meeting. The B & O on April 11 had already prepared a memo for the President detailing the status of the Chicago transfer negotiations and pointing out that "Parmelee assumes responsibility for this service [close connections between trains] and generally does a good job." Keeshin is not mentioned in this memo as a prospective contractor although his proposal was formally before the committee. Furthermore, the New York Central had expressed a very favorable reaction to plaintiff's March 15, 1955 proposal and in summarizing the situation immediately after the May 19, 1955 meeting, the New York Central passenger Vice President noted that both plaintiff and Keeshin were very close in their bidding.
 
 
 55
 In the case of the Pennsylvania Railroad, no records on the transfer negotiations existed for the period from February 15 to June 14, 1955. [Plaintiff offered to prove that such records had been suppressed.]
 
 
 56
 On May 23, President Perlman of the NYC called his Chicago Passenger Agent, Bone, and asked about the Chicago transfer situation. This was the first time in Bone's history with the railroad that he had received a call from Perlman or any President. Bone then sent Perlman's office a copy of plaintiff's latest proposal. On May 23 he assumed that Parmelee would be selected, but on May 24 following Perlman's call he dispatched a memorandum to New York recommending Keeshin.
 
 
 57
 During this period there was telephoning between Keeshin and Cross, from Cross to President Simpson and between Keeshin, Cross and Forgash, the president of U. S. Freight Lines, an affiliate of the New York Central.
 
 
 58
 On May 25, 1955, Cross dispatched three telegrams to the Presidents of the three western railroads whose passenger representatives had recommended the selection of plaintiff, the CNW, I.C. and S.F., which telegrams stated:
 
 
 59
 "Expect to be in Chicago between May 31 and June 2 at which time I shall call stop Hope I may have a short chat with you."
 
 
 60
 Cross came to Chicago on May 31 and stayed to June 3. He first called President Feucht, CNW, and when he found him out of the office left word that he was at the Union League Club. Feucht when he returned told his special counsel, Morehouse, about Cross. Morehouse on June 2 called Cross and visited him in his room at the Union League Club where among other matters they discussed the Transcontinental Class Rate case which was then pending before the Commission. Morehouse reported back to Feucht and late in June 2, Feucht switched the CNW to Keeshin because of the intervention of Cross.
 
 
 61
 Cross visited President Johnston in his office on June 1 or 2. In the evening of June 2, Smart, passenger agent of the I.C., received a telephone call asking him to canvass the other committee railroads as to their attitude. Smart conducted this canvass between the hours of 7 p. m. and 10 p. m. on June 2. Early in the morning of June 3, Smart attended a meeting with the I.C. passenger traffic Vice President and was instructed to switch to Keeshin.
 
 
 62
 President Gurley shortly before June 3 asked his executive Vice President to bring him down to date on the transfer negotiations. Gurley had received no previous memoranda on the Chicago transfer matter. He then received the passenger department's recommendation of plaintiff which made note of the fact that Keeshin had contacted executives of the committee railroads to secure favorable treatment. Gurley instructed his staff to vote for Keeshin and gave no reasons.
 
 
 63
 In this connection the Vice President in charge of passenger traffic testified that he was asked by the Executive Vice President:
 
 
 64
 "whether it was possible without hurting the Santa Fe, to give this contract to Keeshin."
 
 
 65
 After receiving his instructions, this officer then in turn instructed his committee representative:
 
 
 66
 "to vote for him [Keeshin] as a matter of policy."
 
 
 67
 The committee met on June 3 and unanimously voted for Keeshin.
 
 
 68
 Cross had made many long distance telephone calls to Keeshin and to railroad executives. All of these calls were either made from his residence or if placed at the Commission were charged to his home phone. Similarly, Cross expended his own funds in the dispatch of telegrams and in his travels to Baltimore, Philadelphia and Chicago.
 
 
 69
 Cross was to profit personally as follows: First Keeshin arranged to have a U. S. Freight Lines subsidiary buy thirty International Harvester tractors from the Carrolton Farm Supply Agency run by Cross' son on the basis of an override of $150 per tractor, or $4,500. Secondly, Keeshin offered Cross an executive job with his company if he got the transfer contract.
 
 
 70
 Shortly after Keeshin was awarded the transfer contract, Cross on June 29-30 came to Chicago and selected a house in Deerfield, Illinois, for purchase. He executed a contract of purchase on July 11, 1955, after inserting that "possession [was] to be given buyers by September 15, 1955" (Keeshin's service was to commence October 1, 1955) and transmitted this contract by a personally written letter which stated:
 
 
 71
 "Please treat this matter in confidence and withhold the use of my name."
 
 
 72
 On the same day, July 11, Cross listed his house in North Sumner, Maryland, for sale.
 
 
 73
 On July 27, Cross transmitted $4,500 as earnest money on his purchase contract of $38,000.
 
 
 74
 In September, a Senate investigation of Cross' conduct in connection with the Chicago transfer negotiations was instituted and Cross then sought to cancel his contract of purchase. His broker called the seller's attorney and stated:
 
 
 75
 "* * * in view of the Senate Committees investigation with reference to Hugh Cross, Mr. Cross was more anxious than ever to drop the deal and would gladly forfeit the $4500 already paid. CWD told Mr. Wilbur that we would not accept the forfeiture of $4500 in lieu of going through with the deal; that we would enforce the contract by a suit for specific performance in the Circuit Court unless the deal was culminated."
 
 
 76
 Cross moved into the Deerfield house in December 1955, put it up for sale prior to May 1956 and sold the house on May 22, 1956 to an executive officer of defendant, Pennsylvania Railroad.
 
 
 77
 Cross was subject to a Senate investigation of his conduct. In executive session he admitted he had been indiscret and resigned his Commission chairmanship to avoid a public hearing.
 
 
 78
 Defendant railroads had important matters pending for decision before the Interstate Commerce Commission and Cross after his personal contacts with the railroads on behalf of Keeshin continued to participate in the decision of these matters.
 
 
 79
 Plaintiff also offered to prove the extent of damages which it suffered by reason of the alleged illegal conspiracy.
 
 
 80
 According to plaintiff's counsel, this case involves the destruction of a competitive market which was formerly open to any person willing and able to perform transfer services, but which is now closed and in which competition for the rendering of the transfer service has been eliminated by a corrupt conspiracy, in violation of §§ 1 and 2 of the Sherman Act.
 
 
 81
 For many years plaintiff had contracts with the railroads under which it carried through-passengers between the various Chicago railroad stations. It is such a contract that the railroads granted to Transfer in 1955. City of Chicago v. Atchison, T. & S. F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174, affirming 7 Cir., 240 F.2d 930. This contract, being exclusive in its nature, in that sense is a monopoly. However, such a contract is not illegal. United States v. Yellow Cab Co., 332 U.S. 218, 229, 67 S.Ct. 1560, 91 L.Ed. 2010. See, also, Donovan v. Pennsylvania Co., 199 U.S. 279, 297, 26 S.Ct. 91, 50 L.Ed. 192.[7]
 
 
 82
 As we have held, 240 F.2d 930, at pages 936-937, the Chicago railroads, when they entered into the exclusive contract with Transfer, were performing duties imposed upon them by the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.). The Supreme Court said, 357 U.S. 77, at page 87, 78 S.Ct. at page 1069:
 
 
 83
 "* * * We believe the Act authorizes the railroads to engage in this transfer operation themselves or to select such agents as they see fit for that purpose without leave from local authorities."[8]
 
 
 84
 In the incidents involved in the case at bar, the railroads were engaged in selecting such agent as they saw fit for transfer service between Chicago stations. However, plaintiff would bring this case within the ambit of United States v. Yellow Cab Co., 332 U.S. 218, at page 229, 67 S.Ct. 1560, at page 1566, 91 L.Ed. 2010, where the court said:
 
 
 85
 "Any attempt to monopolize or to impose an undue restraint on such a constituent part of interstate commerce brings the Sherman Act into operation. Here there is an alleged conspiracy to bring nearly all the Chicago taxicab companies under common control and to eliminate competition among them relative to contracts for supplying transportation for this transfer in the midst of interstate journeys. Only Parmelee is free to attempt to procure such contracts; Yellow and Cab Sales are forbidden to compete for such contracts, despite the fact that they conceivably might provide the same transportation service at lower cost to the railroads. The complaint accordingly states a violation of the Sherman Act in this respect. * *" (Emphasis supplied.)
 
 
 86
 But the complaint in that case alleged facts showing an absolute bar to competition for the transfer contract. It further showed that that effect was the purpose of an alleged conspiracy.
 
 
 87
 On the other hand, the record in the case at bar shows quite the contrary. No interested bidder for the contract was prevented from competing for it. Competition, which was formally opened in November, 1954 by solicitation of bids and brought bids from plaintiff, Transfer and Willett, proceeded for more than six months. The competition between plaintiff and Transfer was always intense and finally became feverish. Both competitors made adjustments in their propositions in their eagerness to secure the contract with the railroads. The case made out by plaintiff's offers of proof and evidence reflects the unusual attention which high officials of the railroads bestowed upon the bidding. An assertion that the competitive market for this contract was destroyed or that the competition for it was eliminated is belied by the record. While one competitor succeeded and necessarily the other failed, unmistakably there was very strenuous competition. This unavoidable fact undermines the plaintiff's charges under §§ 1 and 2 of the Sherman Act. Nor is this result precluded by the fact (which a court might well find on the case presented by way of offers of proof) that the victory of the successful bidder was made easier by the wrongful conduct of a public official. Assuming the record presented as to his involvement reflects the truth (which we are for this purpose required to do), any party damaged thereby has (and would have had, even before the enactment of the Sherman Act) a ground for relief in the courts of this country. However, the use of conventional antitrust language in drafting a complaint will not extend the reach of the Sherman Act to wrongs not germane to that act, even though such wrongs be actionable under state law. We are not concerned with labels. Otherwise, an adroit antitrust lawyer might use his skill in the use of words to convert many unlawful acts into antitrust violations. The antitrust laws were never meant to be a panacea for all wrongs.
 
 
 88
 In Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, Apex was a hosiery manufacturer in Philadelphia, a substantial part of its product being shipped in interstate commerce. Respondents were a labor organization and its officers, who were charged with conducting a strike at Apex' factory in violation of the Sherman Act. 15 U.S. C.A. § 1.
 
 
 89
 The court said, 310 U.S. at page 483, 60 S.Ct. at page 986:
 
 
 90
 "It is not denied, and we assume for present purposes, that respondents by substituting the primitive method of trial by combat, for the ordinary processes of justice and more civilized means of deciding an industrial dispute, violated the civil and penal laws of Pennsylvania which authorize the recovery of full compensation and impose criminal penalties for the wrongs done. But in this suit, in which no diversity of citizenship of the parties is alleged or shown, the federal courts are without authority to enforce state laws. Their only jurisdiction is to vindicate such federal right as Congress has conferred on petitioner by the Sherman Act and violence, as will appear hereafter, however reprehensible, does not give the federal courts jurisdiction."
 
 
 91
 Significantly, 310 U.S. at page 512, 60 S.Ct. at page 1002, the court said:
 
 
 92
 "These cases show that activities of labor organizations not immunized by the Clayton Act are not necessarily violations of the Sherman Act. Underlying and implicit in all of them is recognition that the Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to `monopolize the supply, control its price, or discriminate between its would-be purchasers'. * * *."
 
 
 93
 The court further said, 310 U.S. at page 513, 60 S.Ct. at page 1002:
 
 
 94
 "If, without such effects on the market, we were to hold that a local factory strike, stopping production and shipment of its product interstate, violates the Sherman law, practically every strike in modern industry would be brought within the jurisdiction of the federal courts, under the Sherman Act, to remedy local law violations. The Act was plainly not intended to reach such a result, its language does not require it, and the course of our decisions precludes it. The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb the balance is not lightly to be imputed to Congress. * * *"
 
 
 95
 Apex was cited with approval in Eastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. Noerr recognized 365 U.S. at page 142, 81 S.Ct. at page 532, that, even though the courts below rested their holding that the Sherman Act had been violated upon a finding that the purpose of the railroads was "more than merely an attempt to obtain legislation. It was the purpose and intent * * * to hurt the truckers in every way possible even though they secured no legislation.", this meant no more than that the truckers sustained some direct injury as an incidental effect of the railroads' compaign to influence governmental action and that the railroads were hopeful that this might happen. Thus, the issue presented by the lower courts' conclusion of a violation of the Sherman Act on the basis of this injury was held to be no different than the issue presented by the factors already discussed.
 
 
 96
 At page 144 of 365 U.S., at page 533 of 81 S.Ct., the court said:
 
 
 97
 "* * * No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices. Indeed, if the version of the facts set forth in the truckers' complaint is fully credited, as it was by the courts below, that effort was not only genuine but also highly successful. Under these circumstances, we conclude that no attempt to interfere with business relationships in a manner proscribed by the Sherman Act is involved in this case."
 
 
 98
 The court was led to this conclusion, 365 U.S. at page 145, 81 S.Ct. at page 533:
 
 
 99
 "* * * But the contest itself appears to have been conducted along lines normally accepted in our political system, except to the extent that each group has deliberately deceived the public and public officials. And that deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned. * * *"
 
 
 100
 In Hunt v. Crumboch, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954, the court, referring to the Sherman Act, said:
 
 
 101
 "* * * That Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce. * * *"
 
 Upon the authority of Apex, it added:
 
 102
 "* * * Whether the respondents' conduct amounts to an actionable wrong subjecting them to liability for damages under Pennsylvania law is not our concern."
 
 
 103
 For the reasons herein stated, we hold that the claim asserted by plaintiff does not set forth a violation of § 1 or § 2 of the Sherman Act. Therefore we affirm the judgment of the district court.
 
 
 104
 Judgment affirmed.
 
 
 
 Notes:
 
 
 [1]
 The district court's opinion is reported in 186 F.Supp. 533
 
 
 [2]
 Atchison, T. & S. F. Ry. Co. v. City of Chicago, 7 Cir., 240 F.2d 930, 933, affirmed 357 U.S. 77, 79, 78 S.Ct. 1063, 2 L.Ed.2d 1174
 
 
 [3]
 This description of the committee we have taken from plaintiff's brief
 
 
 [4]
 The court submitted to the jury the following interrogatory: "Has the selection of Railroad Transfer Service, Inc., rather than Parmelee Transportation Company to perform the interstation transfer service for the railroads terminating in Chicago resulted in injury to the public?" The jury answered, "no"
 
 
 [5]
 The complaint was amended in respects not here material
 
 
 [6]
 Readers of this opinion are cautioned that in this case the truth of the allegations of fact contained in these offers has not been established nor been a subject of inquiry. We assume these facts only for the purpose of this appeal
 
 
 [7]
 To the same effect are Delaware, L. & W. R. R. v. Town of Morristown, 276 U.S. 182, 192, 48 S.Ct. 276, 72 L.Ed. 523; Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 528-529, 48 S.Ct. 404, 72 L.Ed. 681. See also Friend v. Lee, 95 U.S.App.D.C. 224, 221 F.2d 96, 100 note 5
 
 
 [8]
 That railroads have the right to select their agent or contractor is implicit. See § 202(c) (2) of the Interstate Commerce Act. 49 U.S.C.A. § 302(c) (2), which holds the railroads liable for the adequate performance of service and obligations of the agent or contractor under the Act. Status of Parmelee Transportation Co., 288 I.C.C. 95, 104
 
 
 
 105
 DUFFY, Circuit Judge (dissenting).
 
 
 106
 The opinion of the District Court shows this case was decided on the ground the "plaintiff has failed to meet its burden of proving public injury, an essential element of its cause of action in this private treble damage suit. Judgment should therefore be entered for the defendants on this ground." [186 F.Supp. 541.]
 
 
 107
 Over the objections of both sides, trial was had on the issue of public injury only. In my opinion, this was error. The case of Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358, demonstrates that public injury was an irrelevant issue. The many difficulties which were encountered in and grew out of the trial of the instant case, arose because the learned trial judge insisted that the issue of public injury be tried separately and apart from the other issues in the case.
 
 
 108
 It is true, the trial judge also held the facts alleged in the complaint and proved and offered to be proved on the trial of the issue of public injury showed no violation of the antitrust laws. The Court ordered "Judgment should be entered for defendants on this additional ground." (Emphasis supplied)
 
 
 109
 No railroad provides passenger service through Chicago. It is necessary for any through passengers arriving in the city by rail to transfer from one train to another and usually from one station to another. For many years prior to 1955, Parmelee Transportation Company had provided this service.
 
 
 110
 The complaint alleges a conspiracy among the defendants to eliminate competition in the business of transporting passengers between railroad stations in Chicago and of performing pickup and delivery services. This is the very market and type of restraint which the Supreme Court held violated the Sherman Act in United States v. Yellow Cab Company, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010. The Supreme Court there held that any attempt to impose an undue restraint on this market brings the Sherman Act into operation. It said, 332 U.S. at page 229, 67 S.Ct. at page 1566: "Any attempt to monopolize or to impose an undue restraint on such a constituent part of interstate commerce brings the Sherman Act into operation. * * *"
 
 
 111
 In the Yellow Cab case, the Supreme Court considered as a competitive market "contracts with railroads or railroad terminal associations to transport passengers and their luggage between railroad stations in Chicago" (332 U.S. at page 228, 67 S.Ct. at page 1565).
 
 
 112
 It is well established the Sherman Act is applicable to conspiracies of buyers as well as sellers. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219 (see cases cited in footnote 16 on page 235), 68 S.Ct. 996, on page 1006, 92 L.Ed. 1328.
 
 
 113
 The majority opinion apparently recognizes that under the Yellow Cab case, a conspiracy among sellers of transfer service is illegal. I am aware of no reasonable basis for holding that an identical conspiracy between a group of buyers, a public official and one seller is not likewise proscribed.
 
 
 114
 I would reverse and remand for trial upon the merits upon all of the issues in the case.