## ASSOCIATION OF AMERICAN RAILROADS, Plaintiff,

v.

## PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, and Michael D. Greer, Otis D. Casto and Charlotte R. Lane, as members of the Public Service Commission of West Virginia, Defendants,

and

## West Virginia Mining and Reclamation Association and West Virginia Coal Association, Intervening Defendants.

### Civ. A. No. 2:86-0725.

United States District Court,
S.D. West Virginia,
at Charleston.

Dec. 19, 1989.

Final Order and Judgment Dec. 27, 1989.

William C. Beatty, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., R. Eden Martin, Sidley & Austin, Chicago, Ill., or Washington, D.C., for plaintiff.

J. Steven Hunter, Richard E. Hitt, Raymond Keener, III, Charleston, W.Va., for Public Service Com'n of W.Va., Greer, Casto and Lane.

Douglas A. Smoot, Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., for West Virginia Coal Ass'n.

Ricklin Brown, Bowles, McDavid, Graff & Love, Charleston, W.Va., for West Virginia Min. and Reclamation Ass'n.

### MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on cross motions for partial summary judgment filed by the plaintiff, Association of American Railroads (hereinafter, "AAR"), the defendants Public Service Commission of West Virginia (hereinafter, "PSC"), and its members Michael D. Greer, Otis D. Casto, and Charlotte R. Lane, and the intervening defendant, West Virginia Coal Association (hereinafter, "WVCA"), with respect to the

intrastate component of the supremacy clause challenge contained in count I of the amended complaint; and the motion for judgment on the pleadings filed by the intervening defendant, West Virginia Coal Association, with respect to the intrastate component of the supremacy clause challenge contained in count I of the amended complaint.

## I. *Background*

Concerned with the ability of rail carriers to gain access to rail tracks located in the State of West Virginia,[1] the West Virginia Legislature enacted in 1986 Senate Bill 278, codified at W.Va.Code §§ 24–1–1(a)(6) and 24–3–3b(a)–(g). Section 24–3–3b(b) requires all rail carriers owning track in West Virginia to provide all other rail carriers with open access to their tracks.[2] Where the accessed and accessing carrier cannot voluntarily agree upon a reasonable access fee, the PSC is given the authority to prescribe the appropriate fee.[3] Under § 24–3–3b(b), the PSC is charged with the duty of establishing regulations to implement the access provisions of Senate Bill 278.[4] Finally, § 24–3–3b(g) prohibits rail carriers owning track in West Virginia from abandoning or discontinuing the use of their tracks without obtaining prior authorization from the PSC.

On June 27, 1986, plaintiff AAR brought a declaratory action against the PSC and its members,[5] challenging the constitution-

---

**1.** The concern of the West Virginia Legislature was expressed in two separate sections of Senate Bill 278. In W.Va.Code § 24–1–1(a), the legislature explained that its purpose in providing the PSC with authority to set reasonable access rates was to:

> Encourage and support open and competitive marketing of rail carrier services by providing to all rail carriers access to tracks as provided in section three-b [§ 24–3–3b], article three of this chapter. It is the purpose of the Legislature to remove artificial barriers to rail carrier service, stimulate competition, stimulate the free flow of goods and passengers throughout the state and promote the expansion of the tourist industry, thereby improving the economic condition of the state.

W.Va.Code § 24–1–1(a)(6). Further, section 24–3–3b(a) provides:

> The Legislature finds that article XI, section nine of the West Virginia constitution declares railroads in this state to be public highways free to all persons for the transportation of their persons and property, under such regulations as shall be prescribed by the Legislature. It is the policy of this state to protect and promote the economic well-being of its citizens and toward that end to assure the availability of rail transportation services. It is the purpose of this section to promote such vital goals by all available means not in conflict with authority exercised by the federal government in the area of rail transportation.

**2.** Section 24–3–3b(b) states in pertinent part that "[r]ail carriers owning rail tracks located within the borders of this state shall provide open access to such tracks, together with all reasonable, necessary and proper operating facilities for the transportation of passengers and goods to other rail carriers including private carriers transporting their own goods."

**3.** The remainder of section 24–3–3b(b) provides:

> [W]here both the accessed and accessing carrier are negotiating a contract with any person for the transportation of passengers or goods, the accessed carrier shall have the right of first refusal on such contract. The accessed carrier and the accessing carrier shall jointly agree upon a reasonable fee for such access. If the parties cannot reach an agreement on a reasonable access fee, the public service commission shall set a fee pursuant to the provisions of subsection (c) of this section, after taking into consideration the factors set forth in said subsection (c) and giving such weight to each as it may deem appropriate.

**4.** Section 24–3–3b(c) states:

> The commission shall promulgate regulations providing for the establishment and payment of reasonable access fees to the accessed carrier by the accessing carrier and the orderly, efficient and safe utilization of accessed rails and facilities. In establishing access fees, the commission shall consider: The capital investment made by the accessed carrier; a reasonable rate of return thereon; depreciation; costs involved in track maintenance and operation; the necessary use of the accessed carrier's employees and facilities; any loss of employment or wages by employees of the accessed carrier that might reasonably be anticipated because of the activities of the accessing carrier; other reasonable and necessary expenses incurred by the accessed carrier; and the accessing carrier's usage of the accessed track and facilities in relation to the total use of such track and facilities.

**5.** By order of the court dated October 6, 1986, the court granted the motion of the West Virginia Mining and Reclamation Association and the motion of the West Virginia Coal Association to intervene as defendants in this action. In the same order, the court denied the motion

ality of the access and abandonment provisions of Senate Bill 278. Specifically, plaintiff alleged that the access provisions were in violation of the supremacy and commerce clauses of the United States Constitution, and that the abandonment provision was in violation of the supremacy clause. By order dated November 20, 1986, the court granted the parties' joint motion to hold further proceedings in abeyance pending the PSC's adoption of final regulations implementing the access provisions pursuant to the Commission's statutory authority under W.Va.Code § 24-3-3b(c).

The PSC, by order dated October 14, 1987, adopted its final access regulations.[6] Thereafter, plaintiff filed an amended complaint alleging in counts I and II that the access provisions together with the PSC's implementing regulations violate, respectively, the supremacy and commerce clauses of the United States Constitution. Amended Complaint at ¶¶ 45–56. Count III of the amended complaint mirrors plaintiff's allegations in its original complaint that the abandonment provision violates the supremacy clause. Amended Complaint at ¶¶ 57–62. Count IV adds an allegation that the access provisions, combined with the access regulations, violate the takings clause of the United States Constitution. Amended Complaint at ¶¶ 63–68. The final count adds the allegation that the access regulations are inconsistent with the access provisions, are devoid of adequate supporting evidence, and are arbitrary, irrational and an abuse of discretion, all in violation of state law. Amended Complaint at ¶¶ 69–71.

Three separate motions were filed with the court. Plaintiff filed a motion for summary judgment on counts I, II and III of its amended complaint. Defendants filed a motion for summary judgment with respect to counts I, II and IV of the amended complaint, and a motion to dismiss counts II, III and IV on ripeness grounds, and to dismiss count V on abstention principles. Intervening defendant West Virginia Coal Association filed a motion for judgment on the pleadings and for partial summary judgment as to count I of the amended complaint.[7]

On July 14, 1989, this court issued its memorandum opinion. *See Association of American Railroads v. Public Service Commission, et al.,* 745 F.Supp. 1175 (S.D. W.Va.1989). Finding that Congress, in enacting the Interstate Commerce Act (hereinafter, "ICA"), 49 U.S.C. § 10101 *et seq.,* had vested exclusive authority in the Interstate Commerce Commission (hereinafter, "ICC") to regulate trackage rights affecting interstate commerce, the court concluded that "to the extent that the access provisions and regulations apply to trackage rights affecting interstate commerce, they are explicitly preempted." *Id.* at 1180. Accordingly, the court granted the interstate component of plaintiff's motion for summary judgment as to count I of its amended complaint and correspondingly denied to that same extent defendants' motion for summary judgment, as well as intervening defendant WVCA's motion for summary judgment and its motion for judgment on the pleadings, all as to count I of the amended complaint. *Id.* at 1186–87.[8]

of the Consumer Advocate Division of the Public Service Commission to intervene as a defendant in this action.

6. The regulations are divided into two sets of regulations governing carrier access and shipper access. The carrier access regulations apply when a party seeks access to the lines of a rail carrier within the State of West Virginia for the purpose of providing common carrier service by railroad. The shipper access regulations apply when a person seeks access to such lines for purposes other than that of providing common carrier service by railroad. The challenged portion of the regulations is identical and provides the PSC with the authority to issue an access

order where "the Commission finds that the accessing shipper's [or carrier's] use of the access facilities will not unduly interfere with the accessed carrier's own operations." *See* Carrier Regulations § 2.2.12, 150 C.S.R. 19; Shipper Regulations § 2.2.10, 150 C.S.R. 18.

7. The other intervening defendant, the West Virginia Mining and Reclamation Association, joined in the motions of defendants and intervening defendant West Virginia Coal Association.

8. Finding that Congress had likewise vested authority in the ICC to regulate abandonments and that the supremacy clause challenge to the

Turning to the authority of the ICC to regulate trackage rights affecting intrastate commerce, the court first analyzed the impact on this issue of the 1980 amendment to the ICA known as the Staggers Rail Act of 1980, Pub.L. 96–448, 94 Stat. 1914 (1980). The court noted that intrastate rail traffic has long been regulated by the federal government on the theory that such traffic is part of an interstate rail network and can sufficiently affect interstate commerce to permit regulation under the commerce clause of the Constitution. Because the federal commerce clause is plenary, Congress can invoke this power to preempt state regulation of intrastate rail traffic. Before the Staggers Rail Act, the ICC was empowered by Congress to preempt state regulation only where the state was dilatory in acting upon a proposed intrastate rate change, or where an intrastate rate unjustly discriminated against or imposed an undue burden upon intrastate commerce. With the passage of the Staggers Rail Act in 1980, Congress expanded considerably the preemptive power of the ICC over intrastate rail traffic.

Concerned with the financial plight of the railroad industry, particularly the overregulation and the dual regulation by government agencies, Congress ushered in a new era of rail transportation policy with the Staggers Rail Act.[9] To ensure uniformity in intrastate rail regulation, Congress devised a system, embodied in section 11501 of the Act, whereby states could continue to regulate upon condition that their standards and procedures had been submitted and approved by the ICC. 49 U.S.C. §§ 11501(b)(1) and (2).[10] If the

abandonment provision contained in W.Va. Code § 24–3–3b(g) involved a purely facial attack on the statute, the court granted plaintiff's motion for summary judgment and denied defendants' motion to dismiss, based on ripeness concerns, as to count III of the amended complaint. *See Association of American Railroads v. Public Service Commission, et al.,* 745 F.Supp. 1175, 1185–87, relying upon *Chicago & N.W. Tr. Co v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

9. The varying and often conflicting goals of the transportation policy are as follows:

In regulating the railroad industry, it is the policy of the United States Government—
(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;
(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;
(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;
(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;
(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;
(7) to reduce regulatory barriers to entry into and exit from the industry;
(8) to operate transportation facilities and equipment without detriment to the public health and safety;
(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;
(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;
(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;
(12) to encourage fair wage and safe and suitable working conditions in the railroad industry;
(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;
(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and
(15) to encourage and promote energy conservation.
49 U.S.C. § 10101a.

10. Sections 11501(b)(1) and (2) provide:
(b)(1) A state authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this

state's standards and procedures are approved, the state is certified for a five-year period. During this period, the state is required to submit any changes in its standards and procedures to the ICC for its approval. 49 U.S.C. § 11501(b)(5)(B).[11] Moreover, certified states must regulate in a manner consistent with federal standards and procedures. 49 U.S.C. § 11501(b)(1).

West Virginia was certified by the ICC in 1984. *See* Ex Parte No. 388 (Sub–No. 2), *et al., State Intrastate Rail Rate Authority–Arkansas, et al.* (not published) (served Feb. 22, 1984). West Virginia's original certification expired as of March 25, 1989. The ICC, by order of March 23, 1989, provisionally recertified West Virginia, pending final action on West Virginia's recertification request. *See* Ex Parte No. 388 (Sub–No. 35), *State Intrastate Rail Rate Authority–West Virginia* (not published) (served March 23, 1989). West Virginia was required to submit its application for recertification on or before November 17, 1989, and did so on November 16, 1989. West Virginia's recertification application does not seek ICC certification of the challenged access provisions.

Centering on the use of the term "intrastate transportation" contained in section 11501(b)(1), plaintiff argued that the Staggers Rail Act preempted state regulation of all aspects of intrastate transportation, including the means by which one carrier gains access onto another carrier's tracks. Thus, certified states could continue to regulate intrastate transportation only in a manner consistent with federal standards and procedures. Defendants argued that preemption under the Staggers Rail Act is limited to rate-making and rate-related activities. Consequently, certified states would be free to regulate other aspects of intrastate transportation, such as the

means by which one carrier gains access onto another carrier's tracks, in any way they choose. *See AAR v. PSC, supra* at 1178.

As observed in this court's order of July 14, 1989, "[b]efore the court reaches the issue of the preemptive scope of the Staggers Rail Act, a question exists as to whether the access regulations constitute rate-making." *AAR v. PSC, supra* at 1185. Accordingly, the court requested the parties to supplement their original briefs to address the issue of whether the access statutory provisions and regulations constitute rate-making and rate-related activities. That issue is now before the court for decision.

Plaintiff argues that by granting to the PSC the authority to fix the fee that accessing carriers will pay to the accessed carrier, the access statutory provisions and regulations constitute a direct form of rate-regulation. Further, plaintiff contends that the access statutory provisions and regulations constitute an indirect form of rate-regulation in that they allow a carrier to circumvent the delicate balance of rate-regulation under the ICA and obtain relief from supra-competitive rates in circumstances not authorized under the ICA. Conversely, defendants maintain that the access provisions are akin to eminent domain laws and provide a means by which a carrier may obtain a limited property interest in the tracks and facilities of another rail carrier. Further, defendants characterize the access fee set by the PSC as a type of property rental fee and state broadly that the access statutory provisions and regulations do not constitute rate regulation because they do not require the accessed carrier to lower or otherwise alter the rates it ultimately charges.

title if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.

(2) Within 120 days after the effective date of the Staggers Rail Act of 1980, each State authority exercising jurisdiction over intrastate rates, classifications, rules, and practices for intrastate transportation described in paragraph (1) of this subsection shall submit to the Commission the standards and proce-

dures (including timing requirements) used by such State authority in exercising such jurisdiction.

49 U.S.C. §§ 11501(b)(1) and (2).

11. Section 11501(b)(5)(B) provides that "[d]uring any 5–year certification period, a State may not change its certified standards and procedures without notifying and receiving express approval from the Commission."

## II. *Discussion*

There are three types of arrangements by which a rail carrier may gain access to another carrier's tracks and facilities. First, the two carriers could agree to establish through routes by which an accessed carrier would carry the traffic over its own lines and thereafter transfer the traffic onto the accessing carrier at an interchange facility. If the participating rail carrier cannot agree upon the establishment of a particular through route or its terms, the ICC may provide the establishment of the through route as well as the terms for the arrangement where the ICC "considers it desirable in the public interest," 49 U.S.C. § 10705(a)(1) (1989), to establish such an arrangement.

Second, under certain circumstances, the ICC has the authority to require a rail carrier to allow another rail carrier physical access to its terminal area facilities, "including mainline tracks for a reasonable distance outside of a terminal ... if the Commission finds that use to be practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business." 49 U.S.C. § 11103(a). Included within its authority to compel access is the authority of the ICC, in the absence of voluntary agreement between the participating carriers, to set the terms of the arrangement.

Third, an accessing carrier could obtain reciprocal switching service whereby the accessed carrier would operate the accessing carrier's railcars over its own tracks, finally reaching an interchange facility where the accessing carrier regains control over its railcars. In the absence of voluntary agreement, the ICC may require the establishment of such an arrangement as well as its terms where the ICC finds such arrangement "to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service." 49 U.S.C. § 11103(c)(1). *See generally Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1491–92 (D.C.Cir. 1988) (describing the three different ways carriers gain access to other carriers' tracks).

In *Ex Parte 445, Intramodal Rail Competition*, 1 I.C.C.2d 822 (1985), the ICC adopted competitive access rules governing the three types of arrangements described above that required a showing of anticompetitive behavior or other behavior contrary to the competition policies of the ICA on the part of the accessed carrier as a prerequisite to ICC-ordered compelled access (regulations codified at 49 C.F.R. Part 1144 (1986)). In *Midtec*, the Midtec Paper Corporation, an aggrieved shipper, challenged the ICC's interpretation of the competitive access rules' requirement that it demonstrate that the requested accessed carrier, the Chicago and North Western Transportation Company, had acted or was likely to act anticompetitively or contrary to the competition policies of the ICA on the ground, *inter alia*, that the ICC improperly required Midtec to adduce evidence regarding the reasonableness of the rates offered to Midtec by Chicago and North Western.

Midtec's argument was premised upon the fact that under the ICA, the ICC is confined to regulating the maximum reasonable rates charged by a carrier that is market dominant. Market dominance is defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10709(a). A carrier is presumed under the statute not to enjoy market dominance with respect to a specific service where the revenue it obtains from the rates therefor does not exceed by more than a specified percentage, ranging from 160% to 175%, its variable costs in providing the service. *See* 49 U.S.C. § 10709(d)(2).

The purpose of the Staggers Rail Act in granting a certain amount of rate-making freedom to nondominant carriers was to "end for most rail service decades of ICC control over maximum rates and to permit carriers not having market dominance to set rates in response to their perception of market conditions." *See Arkansas Power & Light Co. v. I.C.C.*, 725 F.2d 716, 719 (D.C.Cir.1984) (quoting *Bessemer & L.E.*

*R.R. v. ICC,* 691 F.2d 1104, 1108 (3d Cir. 1982)). At the same time, Congress recognized the need for regulatory intervention "where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital." 49 U.S.C. § 10101a(6). The market dominance test serves both these Congressional policies by presuming that in the absence of market dominance, there is effective competition.

Midtec argued that evidence about specific rates and carrier costs was unnecessary and irrelevant in the competitive access inquiry because section 11103 governing trackage rights was intended by Congress to increase interrail competition in order to offset the general policy of rate-making freedom. As the District of Columbia Circuit explained:

> Midtec argues that in situations of this type, where the Commission lacks authority to prescribe reasonable rates because the captive shipper cannot demonstrate that the carrier is market dominant, section 11103 was intended to take up the slack, so to speak. Otherwise captive shippers facing supra-competitive rates would be faced with a "heads-I win, tails-you lose conundrum." In other words, Midtec contends that section 11103 was intended to be an alternative means of obtaining rate relief, requiring the Commission affirmatively to move the national rail system toward a regime more like perfect competition, with the attendant benefits of marginal cost ratemaking. Captive shippers that are unable to make the case for rate regulation by demonstrating market dominance, on this view, would be able to secure the benefits of effective rail competition through a regulatory order requiring a non-market dominant carrier with some unspecified degree of "market power" to provide competitive access to another carrier.

*Midtec,* 857 F.2d at 1505.

In rejecting Midtec's argument, the District of Columbia Circuit reasoned:

Midtec has not, of course, requested the Commission directly to fix the rates that the C & NW charges the company; it recognizes that the Commission has no authority to do so if the rates Midtec is now being charged do not exceed the level at which a carrier is deemed "market dominant." It would seem just as inconsistent with the compromise between carrier and shipper interests inherent in the market dominance test, however, to conclude that a carrier whose rates do not bespeak market dominance is nonetheless subject to access regulation merely because those same rates are supra-competitive [footnote]. The market dominance test obviously does not ensure that captive shippers will pay only those rates that would obtain under "perfect competition," *i.e.,* rates equal to the marginal cost of providing the service; instead, it expresses a Congressional determination of the circumstances in which competition is deemed to be "effective" and in which regulation is not necessary. The alternative reading Midtec would give to the competition policies of the Act leads to the improbable conclusion that Congress contemplated that a market could be both "effectively competitive," so as to preclude direct rate regulation, and yet insufficiently competitive to require indirect rate regulation through compelled competitive access.

*Id.* at 1506–07. In the footnote above, the court commented that "[a]n order granting terminal trackage rights or reciprocal switching can also lead to direct 'rate regulation' because the Commission is empowered to fix the compensation governing reciprocal switching or terminal trackage rights if the carriers cannot reach agreement." *Id.* at 1506 n. 8.

From the above, it is clear that in setting the fee or rate as between the accessed and accessing carrier, the PSC is engaging in direct rate regulation for that purpose.[12] Further, by allowing captive shippers and

---

**12.** As noted by this court earlier, the means for calculating such rates must be consistent with federal standards and procedure. *AAR v. PSC, supra* at 1185.

other carriers relief from supracompetitive prices through the mechanism of permitting an accessing carrier to compete with the accessed carrier so as to force the ultimate rates down, the state's access statutory provisions and regulations constitute an indirect form of rate regulation that contravenes the modified rate regulation scheme devised and established by the ICA.[13]

Accordingly, the court finds that the access statutory provisions and regulations constitute rate-making and rate-related activities. Because the state has not submitted its access provisions and regulations to the ICC for its approval pursuant to 49 U.S.C. § 11501(b)(5)(B), and further because the access provisions (*see* page 1177, n. 6) grant trackage rights without requiring a showing of anticompetitive behavior rising to the level contemplated by the ICA, they are invalid under the ICA.[14]

It is, therefore, ORDERED that the remainder of plaintiff's motion for summary judgment as to count I of the amended complaint be, and the same hereby is, granted.

Correspondingly, it is ORDERED that the remainder of defendants' motion for summary judgment and intervening defendant WVCA's motion for summary judgment and motion for judgment on the pleadings, all as to count I, be, and the same hereby are, denied.

The parties are directed to prepare a proposed judgment order for entry herein and appear before the court at 1:15 p.m. on December 27, 1989, for its presentation.

**13.** As also observed earlier, the ICC seems to view trackage rights as a type of rate regulation because it will require states seeking recertification to submit their standards and procedures with respect to:

    G.   Joint Rates

    1. For procedures for requesting rail variable costs and revenue determinations for joint rates subject to surcharge or cancellation, see Proc. for Rail Variable Cost and Revenue Determinations, 3 I.C.C.2d 703 (1987) and 49 CFR 1138.

    2. For procedures relating to the cancellations of joint rates and complaints seeking the prescription of joint rates and reciprocal switching arrangements, see Intramodal Rail Competition, 1 I.C.C.2d 822 (1985) and 49 CFR 1144.

*AAR v. PSC, supra* at 1185 (quoting *State Intrastate Rail Rate Authority–Recertification Process,* Ex Parte No. 388A (Feb. 8, 1989)).

**14.** In view of the court's ruling, it is unnecessary to address the larger preemption issue under the Staggers Rail Act. In this regard, the court notes that the District of Columbia Circuit recently found, as defendants had argued, that the Staggers Rail Act only preempts state regulation of rates and rate-related matters. *See Illinois Commerce Com'n v. ICC,* 879 F.2d 917 (D.C. Cir.,1989). Finally, it is likewise unnecessary to address the plaintiff's further challenges to the access statutory provisions and regulations contained in counts II, IV and V, as well as defendants' arguments based on abstention and ripeness grounds.