CITY OF CHICAGO *v.* ATCHISON, TOPEKA &
SANTA FE RAILWAY CO. ET AL.

No. 103.   Argued March 5–6, 1958.—Decided June 16, 1958.*

*Together with No. 104, *Parmelee Transportation Co. et al.* v. *Atchison, Topeka & Santa Fe Railway Co. et al.,* on appeal from, and petition for certiorari to, the United States Court of Appeals for the Seventh Circuit, argued March 6, 1958.

*Joseph F. Grossman* argued the cause for petitioner in No. 103. With him on the brief was *John C. Melaniphy.*

*Philip B. Kurland* argued the cause for appellants-petitioners in No. 104. With him on the brief were *Lee A. Freeman* and *Brainerd Currie* for the Parmelee Transportation Co., appellant-petitioner. *John C. Melaniphy* filed an appearance for the City of Chicago, appellant-petitioner.

*Amos M. Mathews* argued the causes for respondents in No. 103 and appellees-respondents in No. 104. On the briefs were *Jerome F. Dixon* and *Albert J. Meserow* for the Railroad Transfer Service, Inc., and *Mr. Mathews* and *J. D. Feeney, Jr.* for the Atchison, Topeka & Santa Fe Railway Co. et al., respondents in No. 103 and appellees-respondents in No. 104.

MR. JUSTICE BLACK delivered the opinion of the Court.

Chicago is one of the Nation's great rail centers. Each day thousands of railroad passengers travel through that City on continuous journeys from one State to

another. Since the lines of all railroads which carry passengers into and out of Chicago come to an end in one of that City's eight terminals, through passengers frequently arrive at a station different from the one where they are to board their outgoing train and must transfer with their baggage in order to continue their trip. Because of the serious problems of scheduling and passenger convenience involved in this interchange, the railroads, as a group, have long provided for the transfer of through passengers from one station to another by a systematic and highly organized motor carrier operation. Generally the passengers receive a coupon covering this transfer service, without special charge, as part of their through ticket.

For many years the railroads had an arrangement with Parmelee Transportation Company under which it carried through passengers between stations. Apparently finding its service no longer desirable, the railroads notified Parmelee in June 1955 that they would discontinue using its transfer vehicles as of October 1, 1955. Subsequently they engaged Railroad Transfer Service, a corporation specially organized at their request for that purpose, as their exclusive transfer agent for a five-year period commencing with the termination of Parmelee's service.

At the time the railroads gave Parmelee their notice the City of Chicago had in effect a detailed plan for the regulation and licensing of public passenger vehicles for hire. Among other things, operation of any public passenger vehicle, including a vehicle engaged in the transfer of passengers between railroad stations, was prohibited unless it had been licensed by the City. Any person who operated one of these vehicles without a license was subject to arrest and punishment.

After the railroads announced they intended to use the facilities of Railroad Transfer Service instead of those of

Parmelee, the City Council proceeded to amend the Municipal Code so as to effect certain important changes with regard to the licensing of transfer vehicles. A new section, 28–31.1, was added. In substance, it provided that no license for a transfer vehicle would issue unless the City Commissioner of Licenses first determined that public convenience and necessity required additional interterminal service. In that event, the City Council reserved final discretion to determine how many, if any, new licenses were to be issued. In making his determination the Commissioner was authorized to consider public demand for the proposed additional transfer service, its economic feasibility, public safety and, generally, any other facts he might think relevant.[1] If § 28–31.1 validly

---

[1] In full, the section read:

"28–31.1 Public Convenience and Necessity. No license for any terminal vehicle shall be issued except in the annual renewal of such license or upon transfer to permit replacement of a vehicle for that licensed unless, after a public hearing held in the same manner as specified for hearings in section 28–22.1, the commissioner shall report to the council that public convenience and necessity require additional terminal vehicle service and shall recommend the number of such vehicle licenses which may be issued.

"In determining whether public convenience and necessity require additional terminal vehicle service due consideration shall be given to the following:

"1. The public demand for such service;

"2. The effect of an increase in the number of such vehicles on the safety of existing vehicular and pedestrian traffic in the area of their operation;

"3. The effect of an increase in the number of such vehicles upon the ability of the licensee to continue rendering the required service at reasonable fares and charges to provide revenue sufficient to pay for all costs of such service, including fair and equitable wages and compensation for licensee's employees and a fair return on the investment in property devoted to such service;

"4. Any other facts which the commissioner may deem relevant.

"If the commissioner shall report that public convenience and necessity require additional terminal vehicle service, the council, by

applied to Railroad Transfer Service that company was required to secure a certificate of convenience and necessity from the Commissioner plus the approval of the City Council before it could lawfully transfer any passengers for the railroads. On the other hand, Parmelee was permitted to continue operating without leave from the City since an exception in § 28–31.1 provided that no certificate was necessary for the renewal of an existing license. Parmelee's vehicles were all licensed, of course, at the time the section became effective.

As scheduled, Transfer began to carry passengers between stations on October 1, 1955.[2] However, it refused to apply for a certificate of convenience and necessity, taking the position that § 28–31.1 was either inapplicable to its vehicles or, if applicable, invalid. The City rejected this contention and threatened to arrest and fine Transfer's drivers if they operated unlicensed vehicles. Transfer and the railroads then filed this suit in United States District Court asking for a judgment declaring § 28–31.1 either inapplicable or invalid. The complaint asserted that the City's requirement of a certificate of convenience and necessity was inconsistent with the provisions of the Interstate Commerce Act as well as the Commerce Clause of the Constitution insofar as it applied to vehicles transferring interstate passengers from one railroad station to another under agreement with the railroads. The City filed no answer but moved for a summary judgment. Parmelee was permitted to intervene as a defendant.

---

ordinance, may fix the maximum number of terminal vehicle licenses to be issued not to exceed the number recommended by the commissioner." Chicago Municipal Code, c. 28, § 28–31.1.

[2] In accordance with its agreement with the railroads, Transfer's operation is limited exclusively to transporting through passengers from one railroad station to another. It carries no other passengers.

The district judge, pointing out that there were no genuine issues of fact, granted the City's motion and dismissed the complaint. But the Court of Appeals for the Seventh Circuit reversed. 240 F. 2d 930. It agreed with the District Court that § 28–31.1 applied to Transfer's operation, but held that the section as so applied was repugnant on its face to the Constitution and laws of the United States. We granted the City's petition for certiorari, 353 U. S. 972, but postponed assuming jurisdiction on an appeal by Parmelee until further consideration at the hearing on the merits, 353 U. S. 971. Counsel for Parmelee and Transfer were asked to discuss the following jurisdictional questions:

"1. Whether Parmelee Transportation Co. has standing to seek review here on appeal or by writ of certiorari.

"2. Whether the judgment of the Court of Appeals is 'final' so as to permit review by way of appeal under 28 U. S. C. § 1254 (2). Cf. *Slaker* v. *O'Connor,* 278 U. S. 188, 189; *South Carolina Electric & Gas Co.* v. *Flemming,* 351 U. S. 901."

*First.* The judgment of the Court of Appeals is the proper subject of an appeal. Under 28 U. S. C. § 1254 (2) this Court may review cases on appeal where a Court of Appeals has held a state statute invalid as repugnant to the Constitution, treaties or laws of the United States. In *Slaker* v. *O'Connor,* 278 U. S. 188, 189, the Court construed the substantially identical predecessor of § 1254 (2) [3] as requiring a "final" judgment in a case before an appeal could be taken. The *Slaker* case was followed without comment, as to § 1254 (2) itself, by the per curiam opinion in *South Carolina Electric & Gas Co.* v. *Flemming,* 351 U. S. 901. Counsel for Parmelee, rely-

---

[3] § 240 (b) of the Judiciary Act of 1925, 43 Stat. 939.

ing on the language and legislative history of § 1254 (2) and its predecessor, forcefully argue that the requirement of finality announced in the *Slaker* case is erroneous and should be overruled. We find it unnecessary however to pass on this contention here because we are convinced that the judgment below was "final" by any relevant standard.

By its decision the Court of Appeals resolved all disputed questions between the parties. From the beginning the only issues in the case were whether § 28–31.1 was applicable to Transfer and, if applicable, whether that section was consistent with federal law. The Court of Appeals held the section applied to Transfer but was unconstitutional. There was nothing more to litigate; all that remained for the District Court on remand was to formally enter judgment for the plaintiff. Compare *Pope* v. *Atlantic Coast Line R. Co.*, 345 U. S. 379, 381–383.

*Second.* Parmelee has standing to secure review of the judgment below by appeal. It is enough, for purposes of standing, that we have an actual controversy before us in which Parmelee has a direct and substantial personal interest in the outcome. Undoubtedly it is affected adversely by Transfer's operation. Parmelee contends that this operation is prohibited by a valid city ordinance and asserts the right to be free from unlawful competition. Transfer, on the other hand, suggests that Parmelee has no standing because the city ordinance is invalid and Transfer's operation is lawful. It argues that a party has no right to complain about lawful competition, citing *Alabama Power Co.* v. *Ickes*, 302 U.'S. 464, and *Tennessee Electric Power Co.* v. *Tennessee Valley Authority*, 306 U. S. 118. We do not regard either of these cases as controlling here. It seems to us that Transfer's argument confuses the merits of the controversy with the standing of Parmelee to litigate them. Cf. *Bell* v. *Hood*, 327 U. S. 678. Parmelee's standing could hardly depend on whether

or not it is eventually held that Transfer can lawfully operate without a certificate of convenience and necessity.[4]

*Third.* There is still another preliminary point which must be decided. The City argues that the courts below should not have passed on the validity of § 28–31.1 until state courts had authoritatively ruled that Transfer's terminal vehicles came within its provisions. The City asks that we vacate the judgment of the Court of Appeals and remand to the District Court with directions to hold the case until efforts to obtain an adjudication in the state courts have been exhausted. Under the circumstances we do not believe this procedure is warranted.

After full argument on that point, both the District Court and a unanimous Court of Appeals held that § 28–31.1 applied to Transfer. That was the position of the city in both courts and it made no move there to have the matter remitted to the state courts. After referring to the provisions of § 28–31.1 the City declared in its brief in the Court of Appeals: "A more accurate description of the business engaged in by Transfer would be hard to find." We think this is a fair summarization. We see no ambiguity in the section which calls for interpretation by the state courts. Cf. *Toomer* v. *Witsell,* 334 U. S. 385. Remission to those courts would involve substantial delay and expense, and the chance of a result different from that reached below, on the issue of applicability, would appear to be slight.

*Fourth.* We agree with the Court of Appeals that § 28–31.1 is invalid insofar as it requires Transfer to secure a certificate of convenience and necessity before it can operate. By its terms § 28–31.1 gives the City Commissioner of Licenses, and ultimately the City Counsel itself, virtually unlimited discretion to determine who

[4] Since No. 104 is properly here on appeal, the petition for certiorari in that case is denied.

may transfer interstate passengers and baggage between railroad terminals. Although counsel for the City denies that it will use this power to exclude proposed transfer operations wholly or primarily because of economic considerations (cf. *Buck* v. *Kuykendall,* 267 U. S. 307), it is clear that the City claims at least some power under § 28–31.1 to decide whether a motor carrier may transport passengers from one station to another. In our judgment the provisions of the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 1 *et seq.,* preclude the City from exercising any veto power over such transfer service when performed by the railroads or by their chosen agents.

Section 1 (4) of that Act reads:

> "It shall be the duty of every common carrier subject to this chapter . . . to establish reasonable through routes with other such carriers . . . [and] to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation . . . ."

Section 3 (4) provides:

> "All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines . . . ."

Complementing these provisions, § 15 (3) specifically empowers the Interstate Commerce Commission to establish reasonable through routes whenever necessary or desirable in the public interest.[5]

---

[5] Section 12 generally authorizes and requires the Commission "to execute and enforce" all of the provisions of the Act.

As we understand these sections they not only authorize the railroads to take all reasonable and proper steps for the transfer of persons and property between their connecting lines, but impose affirmative obligations on them in this respect. See *United States* v. *Pennsylvania R. Co.*, 323 U. S. 612; *Central Transfer Co.* v. *Terminal Railroad Association of St. Louis*, 288 U. S. 469, 473, n. 1. Although the railroads may not be obligated to furnish transfer service between terminals in every instance, it seems apparent that such service would often be necessary if the statutory requirements were to be observed. On this basis the Interstate Commerce Commission has held that it has authority to require motor service between terminals. See *Cartage, Rail to Steamship Lines at New York*, 269 I. C. C. 199. Here the railroads have furnished transfer facilities for the heavy flow of traffic between the numerous Chicago terminals for more than a century. It is agreed that transportation by motor vehicle is now the only practical means of moving this traffic from terminal to terminal. We think the transfer service involved is at least authorized, if not actually required, under the Act as a reasonable and proper facility for the interchange of passengers and their baggage between connecting lines.

Moreover, § 302 (c) of the Act provides that motor vehicle transportation between terminals, whether performed by a railroad or by an agent or contractor of its choosing, shall be regarded as railroad transportation and shall be subject to the same comprehensive scheme of regulation which applies to such transportation.[6] While

---

[6] In pertinent part, § 302 (c) reads:

"Notwithstanding any provision of this section or of section 303 of this title, the provisions of [Chapter 8 of the Act regulating motor carriers] . . . shall not apply—

"(1) to transportation by motor vehicle by a carrier by railroad . . . incidental to transportation or service subject to [regulation by the Interstate Commerce Commission under Chapter 1 of the

the Interstate Commerce Commission has not yet adopted special regulations for interstation transfer service it obviously can do so at any time under this section. In the meantime many of the Commission's regulations which generally govern railroad transportation apply to this service. And even without Commission action a number of the provisions of the Interstate Commerce Act itself are self-executing in their application.

The various provisions set forth above manifest a congressional policy to provide for the smooth, continuous and efficient flow of railroad traffic from State to State subject to federal regulation. In our view it would be inconsistent with this policy if local authorities retained the power to decide whether the railroads or their agents could engage in the interterminal transfer of interstate passengers. We believe the Act authorizes the railroads to engage in this transfer operation themselves or to select such agents as they see fit for that purpose without leave from local authorities.

National rather than local control of interstate railroad transportation has long been the policy of Congress. It is not at all extraordinary that Congress should extend freedom from local restraints to the movement of inter-

---

Act as railroad transportation or service] . . . in the performance within terminal areas of transfer, collection, or delivery services; but such transportation shall be considered to be and shall be regulated as transportation subject to chapter 1 of this title when performed by such carrier by railroad . . . .

"(2) to transportation by motor vehicle by any person (whether as agent or under a contractual arrangement) for a common carrier by railroad subject to chapter 1 of this title . . . in the performance within terminal areas of transfer, collection, or delivery service; but such transportation shall be considered to be performed by such carrier . . . as part of, and shall be regulated in the same manner as, the transportation by railroad . . . to which such services are incidental." 49 U. S. C. § 302 (c).

state traffic between railroad terminals. Serious impediments to the efficient and uninterrupted flow of this traffic might well result if the City could deny the railroads the right to transfer passengers by their own vehicles or by those of their selected agents. For example, the railroads here undoubtedly have a better understanding of how to handle the transportation problems involved in expeditiously moving thousands of passengers from station to station each day than do local officials. Because of close time schedules, the great volume of traffic and its irregular ebb and flow, the railroads obviously need a cooperative and dependable transfer operator with suitable equipment who is willing to work in close harmony with them. The railroads have rejected as unsuitable the only transfer service now licensed to operate by the City. If local officials can prevent them from providing this service by some other means a breakdown in the organized transfer of passengers could result. At a minimum they would be forced to deal once again with the rejected operator. Moreover, it seems clear that if the City could deny a license to one operator it has the power, at least so far as the Interstate Commerce Act is concerned, to deny a license to all.

We are fully aware that use of local streets is involved, but no one suggests that Congress cannot require the city to permit interstate commerce to pass over those streets. Of course the City retains considerable authority to regulate how transfer vehicles shall be operated. It could hardly be denied, for example, that such vehicles must obey traffic signals, speed limits and other general safety regulations. Similarly the City may require registration of these vehicles and exact reasonable fees for their use of the local streets. Cf. *Fry Roofing Co.* v. *Wood,* 344 U. S. 157; *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542. All we hold here, and all we construe the Court of Appeals as holding, is that the City has no

power to decide whether Transfer can operate a motor vehicle service between terminals for the railroads because this service is an integral part of interstate railroad transportation authorized and subject to regulation under the Interstate Commerce Act. Cf. *Castle* v. *Hayes Freight Lines,* 348 U. S. 61.

*Fifth.* Since we hold that § 28–31.1 is completely invalid insofar as it applies to Transfer, that company was not obligated to apply for a certificate of convenience and necessity and submit to the administrative procedures incident thereto before bringing this action. See *Smith* v. *Cahoon,* 283 U. S. 553, 562; *Public Utilities Commission of California* v. *United States,* 355 U. S. 534, 539–540. Cf. *Staub* v. *City of Baxley,* 355 U. S. 313, 319.

*Affirmed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON join, dissenting.

In my opinion the Court has acted prematurely in striking down this Chicago ordinance as it relates to Transfer. I accept the premise that the railroads have the right to choose whom they please to perform the transfer services, subject only to the City's right to regulate how transfer vehicles shall be operated. Nevertheless, the validity of the ordinance should not be determined until Transfer has applied to Chicago for a "terminal" license and the local authorities have had an opportunity to act on the application. Not until then will it be known whether the ordinance, as it may be applied to Transfer's operations, trespasses upon paramount federal concerns. Proper regard for the City's legitimate interests in enforcing this local enactment entitles Chicago to that opportunity. Cf. *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534, 546 (dissenting opinion).

No provision of the Interstate Commerce Act purports to pre-empt Chicago's power to apply its ordinance to one in the position of Transfer. This is therefore not a case where particular provisions of federal and local legislation conflict in such a way that they cannot logically or practically stand together, cf. *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148; *First Iowa Hydro-Electric Cooperative* v. *Federal Power Comm'n,* 328 U. S. 152, nor one where there is such overall similarity between federal and state regulation that a congressional purpose to displace state action in its entirety can fairly be deduced. Cf. *Hines* v. *Davidowitz,* 312 U. S. 52; *Pennsylvania* v. *Nelson,* 350 U. S. 497. And because Transfer does not hold a certificate of necessity from the Interstate Commerce Commission, and seemingly cannot get one, see *Status of Parmelee Transportation Co.,* 288 I. C. C. 95, no conflict appears between federal and local regulatory policies respecting those performing transfer services. Cf. *Castle* v. *Hayes Freight Lines, Inc.,* 348 U. S. 61. The sole question is thus whether the ordinance must be struck down, when applied to Transfer's operations, as "inconsistent" with the policy of the Interstate Commerce Act to foster efficient interstate transportation.

In determining whether Chicago's ordinance should now be annulled it must be borne in mind that local authorities are not foreclosed from regulating matters of local concern merely because there may be some incidental, but not burdensome, effect on interstate commerce. At least since *Cooley* v. *Board of Wardens,* 12 How. 299, it has been recognized that because regulation of local incidents of interstate transportation is, as a practical matter, beyond the effective reach of Congress, there would frequently be an undesirable absence of needed regulation unless States and municipalities were free to act. See *California* v. *Thompson,* 313 U. S. 109; see also *H. P. Welch Co.* v. *New Hampshire,* 306 U. S. 79; *Eichholz* v.

*Public Service Comm'n of Missouri,* 306 U. S. 268. So much indeed is recognized by the Court today when it says that Chicago, as part of its "considerable authority" to regulate the operation of transfer vehicles, may exact fees for their use of the city streets and may require them to meet with safety regulations and to be registered with the City. And, of course, the Court's examples do not exhaust the scope of local regulatory power to insure safe transportation. Nor can I perceive why the City should not be permitted to exercise such power before permitting unlicensed vehicles to travel on its streets. On the other hand, I would agree that Chicago, under the guise of promoting safe and proper transportation, could not validly limit on "economic" grounds those with whom the railroads may contract to carry its interstate passengers through the City. Cf. *Buck* v. *Kuykendall,* 267 U. S. 307.

We do not yet know how Chicago will apply the ordinance. If it should grant Transfer a license, that will end the present controversy. If a license is denied, it will then be time enough to determine whether the basis for denial runs afoul of federal transportation policy. It is true that the ordinance gives the City broad authority, but that does not justify the assumption that such authority will be exercised beyond permissible bounds, especially since Chicago has acknowledged that it could not properly withhold a license "solely or even primarily" because existing transfer facilities were adequate or because additional licenses would adversely affect the competitive situation. Only by refraining from passing on the ordinance until Chicago has had a chance to act under it, do we respect the long-standing tradition of this Court not to interfere prematurely with the administration of state and local enactments. See, *e. g., Alabama Federation of Labor* v. *McAdory,* 325 U. S. 450; *Public Service Comm'n of Utah* v. *Wycoff Co.,* 344 U. S. 237.

Cf. *Spector Motor Service, Inc.*, v. *McLaughlin*, 323 U. S. 101.

The fact that this course of action would involve some further delay and expense does not, in my judgment, justify by-passing the municipal authorities. Transfer accepted the risk of such a result when it failed to apply for a license in the first instance. And if it is said that this course will expose the transfer operations to hazards in the interval, the answer is that the Federal District Court in Chicago possesses ample authority to prevent any interference with Transfer's activities pending final adjudication of the matters in controversy.

Some years ago, in a situation closely analogous to the one before us, this Court approved the decision of a three-judge District Court declining to entertain a complaint attacking the constitutionality of a Missouri statute which prohibited interstate carriers from using state highways without obtaining a permit from the State, on the ground that the complainant had not applied for such a permit. *Columbia Terminals Co.* v. *Lambert*, 30 F. Supp. 28; 309 U. S. 620. I believe that *Columbia Terminals* provides the guiding principle for the appropriate disposition of premature challenges to the validity of local ordinances. However, in view of the posture of the present litigation, I would follow a somewhat different course here, and would vacate the judgment of the Court of Appeals and remand the case to the District Court. Our mandate should enable the District Court to stay the operation of Chicago's ordinance and to retain jurisdiction over this case, pending Transfer's prompt steps to initiate license proceedings before the local authorities and the outcome of such proceedings.