ASSOCIATION OF AMERICAN
RAILROADS, Plaintiff,

v.

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, and Michael D. Greer, Otis D. Casto and Charlotte R. Lane, as members of the Public Service Commission of West Virginia, Defendants,

and

West Virginia Mining and Reclamation Association and West Virginia Coal Association, Intervening Defendants.

Civ. A. No. 2:86–0725.

United States District Court,
S.D. West Virginia,
at Charleston.

July 14, 1989.

Final Order and Judgment Dec. 27, 1989.

See also, 745 F.Supp. 1188.

William C. Beatty, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., R. Eden Martin, Sidley & Austin, Chicago, Ill., or Washington, D.C., for plaintiff.

J. Steven Hunter, Richard E. Hitt, Raymond Keener, III, Charleston, W.Va., for Public Service Com'n of W.Va., Greer, Casto and Lane.

Douglas A. Smoot, Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., for West Virginia Coal Ass'n.

Ricklin Brown, Bowles, McDavid, Graff & Love, Charleston, W.Va., for West Virginia Min. and Reclamation Ass'n.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the motion for partial summary judgment as to counts I, II and III of the amended complaint filed by the plaintiff, Association of American Railroads (hereinafter, "AAR"); the motion to dismiss counts II, III, IV and V and for partial summary judgment as to counts I, II and IV filed by the defendants Public Service Commission of West Virginia (hereinafter, "PSC"), and its members, Michael D. Greer, Otis D. Casto, and Charlotte R. Lane; and the motion for judgment on the pleadings as to count I and motion for partial summary judgment as to count I filed by the intervening defendant, West Virginia Coal Association.

### I. *Background*

Concerned with the ability of rail carriers to gain access to rail tracks located in the State of West Virginia,[1] the West Virginia

---

1. The concern of the West Virginia Legislature was expressed in two separate sections of Senate Bill 278. In W.Va.Code § 24–1–1(a), the legislature explained that its purpose in providing the PSC with authority to set reasonable access rates was to:

> Encourage and support open and competitive marketing of rail carrier services by providing to all rail carriers access to tracks as provided in section three-b [§ 24–3–3b], article three of this chapter. It is the purpose of the Legislature to remove artificial barriers to

rail carrier service, stimulate competition, stimulate the free flow of goods and passengers throughout the state and promote the expansion of the tourist industry, thereby improving the economic condition of the state. W.Va.Code § 24–1–1(a)(6). Further, section 24–3–3b(a) provides:

> The Legislature finds that article XI, section nine of the West Virginia constitution declares railroads in this state to be public highways free to all persons for the transportation of their persons and property, under such

Legislature enacted in 1986 Senate Bill 278, codified at W.Va.Code §§ 24-1-1(a)(6) and 24-3-3b(a)-(g). Section 24-3-3b(b) requires all rail carriers owning track in West Virginia to provide all other rail carriers with open access to their tracks.[2] Where the accessed and accessing carrier cannot voluntarily agree upon a reasonable access fee, the PSC is given the authority to prescribe the appropriate fee.[3] Under § 24-3-3b(c), the PSC is charged with the duty of establishing regulations to implement the access provisions of Senate Bill 278.[4] Finally, § 24-3-3b(g) prohibits rail carriers owning track in West Virginia from abandoning or discontinuing the use of their tracks without obtaining prior authorization from the PSC.[5]

On June 27, 1986, plaintiff AAR brought a declaratory action against the PSC and its members,[6] challenging the constitutionality of the access and abandonment provisions of Senate Bill 278. Specifically, plaintiff alleged that the access provisions were in violation of the supremacy and commerce clauses of the United States Constitution, and that the abandonment provision was in violation of the supremacy clause. By order dated November 20, 1986, the court granted the parties' joint motion to hold further proceedings in abeyance pending the PSC's adoption of final regulations implementing the access provisions pursuant to the Commission's statutory authority under W.Va.Code § 24-3-3b(c).

The PSC, by order dated October 14, 1987, adopted its final access regulations.[7]

regulations as shall be prescribed by the Legislature. It is the policy of this state to protect and promote the economic well-being of its citizens and toward that end to assure the availability of rail transportation services. It is the purpose of this section to promote such vital goals by all available means not in conflict with authority exercised by the federal government in the area of rail transportation.

2. Section 24-3-3b(b) states in pertinent part that "[r]ail carriers owning rail tracks located within the borders of this state shall provide open access to such tracks, together with all reasonable, necessary and proper operating facilities for the transportation of passengers and goods to other rail carriers including private carriers transporting their own goods."

3. The remainder of section 24-3-3b(b) provides:

[W]here both the accessed and accessing carrier are negotiating a contract with any person for the transportation of passengers or goods, the accessed carrier shall have the right of first refusal on such contract. The accessed carrier and the accessing carrier shall jointly agree upon a reasonable fee for such access. If the parties cannot reach an agreement on a reasonable access fee, the public service commission shall set a fee pursuant to the provisions of subsection (c) of this section, after taking into consideration the factors set forth in said subsection (c) and giving such weight to each as it may deem appropriate.

4. Section 24-3-3b(c) states:

The commission shall promulgate regulations providing for the establishment and payment of reasonable access fees to the accessed carrier by the accessing carrier and the order-

ly, efficient and safe utilization of accessed rails and facilities. In establishing access fees, the commission shall consider: The capital investment made by the accessed carrier; a reasonable rate of return thereon; depreciation; costs involved in track maintenance and operation; the necessary use of the accessed carrier's employees and facilities; any loss of employment or wages by employees of the accessed carrier that might reasonably be anticipated because of the activities of the accessing carrier; other reasonable and necessary expenses incurred by the accessed carrier; and the accessing carrier's usage of the accessed track and facilities in relation to the total use of such track and facilities.

5. Section 24-3-3b(g) prescribes:

No rail carrier owing rail tracks in the state of West Virginia shall discontinue or abandon use of such trackage without first obtaining authority from the commission to do so, unless the same be done under uniform rules and regulations filed by such rail carrier with the public service commission and approved by said commission.

6. By order of the court dated October 6, 1986, the court granted the motion of the West Virginia Mining and Reclamation Association and the motion of the West Virginia Coal Association to intervene as defendants in this action. In the same order, the court denied the motion of the Consumer Advocate Division of the Public Service Commission to intervene as a defendant in this action.

7. The regulations are divided into two sets of regulations governing carrier access and shipper access. The carrier access regulations apply when a party seeks access to the lines of a rail carrier within the State of West Virginia for the

Thereafter, plaintiff filed an amended complaint alleging in counts I and II that the access provisions together with the PSC's implementing regulations violate, respectively, the supremacy and commerce clauses of the United States Constitution. Amended Complaint at ¶¶ 45–56. Count III of the amended complaint mirrors plaintiff's allegations in its original complaint that the abandonment provision violates the supremacy clause. Amended Complaint at ¶¶ 57–62. Count IV adds an allegation that the access provisions, combined with the access regulations, violate the takings clause of the United States Constitution. Amended Complaint at ¶¶ 63–68. The final count adds the allegation that the access regulations are inconsistent with the access provisions, are devoid of adequate supporting evidence, and are arbitrary, irrational and an abuse of discretion, all in violation of state law. Amended Complaint at ¶¶ 69–71.

On December 14, 1987, three separate motions were filed with the court. Plaintiff filed a motion for summary judgment on counts I, II and III of its amended complaint. Defendants filed a motion for summary judgment with respect to counts I, II and IV of the amended complaint, and a motion to dismiss counts II, III and IV on ripeness grounds, and to dismiss count V on abstention principles. Intervening defendant West Virginia Coal Association filed a motion for judgment on the pleadings and for partial summary judgment as to count I of the amended complaint.[8]

Although three separate motions have been filed, the issue presented in each of the three motions with respect to count I of the amended complaint is the same and involves judicial resolution of the purely legal question of whether the state's access provisions and regulations are preempted by the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.* In this regard, plaintiff argues that embodied within the Interstate Commerce Act is a comprehensive scheme of regulation of interstate rail transportation, including carriers'[9] attempts to gain access to other carriers' tracks for use in interstate commerce, which has long been recognized as preempting state regulation in this area. With respect to access to tracks for use in intrastate commerce, plaintiff maintains that upon passage of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat.1914 (1980), states are permitted to regulate intrastate rail transportation, including access to other carriers' tracks, only if the state's standards and practices are certified by the Interstate Commerce Commission (hereinafter, "ICC") and are consistent with federal law. Defendants respond that although the ICC has been given considerable authority under the Interstate Commerce Act to regulate interstate rail transportation, states still retain some regulatory authority pursuant to their traditional police powers. With respect to regulation of intrastate rail transportation, defendants contend that the requirements under the Staggers Rail Act that states receive ICC certification and regulate consistently with federal law is limited to state regulation of intrastate rail rates and that states retain their authority to freely regulate nonrate-related aspects of intrastate rail transportation, including carriers' access to tracks for use in intrastate commerce.

Similarly, the issue with respect to count III of the amended complaint involves judi-

---

purpose of providing common carrier service by railroad. The shipper access regulations apply when a person seeks access to such lines for purposes other than that of providing common carrier service by railroad. The challenged portion of the regulations is identical and provides the PSC with the authority to issue an access order where "the Commission finds that the accessing shipper's [carrier's] use of the access facilities will not unduly interfere with the accessed carrier's own operations." *See* Carrier Regulations § 2.2.12, 150 C.S.R. 19; Shipper Regulations § 2.2.10, 150 C.S.R. 18.

**8.** The other intervening defendant, the West Virginia Surface Mining and Reclamation Association, joined in the motions of defendants and intervening defendant West Virginia Coal Association.

**9.** Although in its discussion the court refers to carriers' attempts at access onto other carriers' tracks, the reasoning applies with equal force to shippers' attempts. Whether access is sought by shippers or carriers, the real issue is the propriety of allowing the state to require access to another carrier's tracks.

cial resolution of the purely legal questions of whether the state's abandonment provision is preempted by the Interstate Commerce Act, and whether the question is ripe for review. In this regard, plaintiff states that recent Supreme Court authority acknowledges the primacy of ICC regulation of abandonments under the Interstate Commerce Act which also extends to abandonments of tracks used in intrastate commerce that affect interstate commerce. Defendants argue that the issue is not ripe for review because neither the PSC nor the state's highest court has interpreted the meaning of the state's abandonment provision. To this ripeness argument, plaintiff counters that the question is ripe for review because it presents a facial challenge to the wording of the statute.

## II.  *Discussion*

The supremacy clause contained in Article VI, cl. 2 of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const., Art. VI, cl. 2. The supremacy clause has been interpreted as invalidating all state laws that conflict or interfere with an act of Congress. *See Rose v. Arkansas State Police,* 479 U.S. 1, 3, 107 S.Ct. 334, 335, 93 L.Ed.2d 183 (1986) (per curiam). Similarly, administrative regulations promulgated pursuant to congressional authorization are deemed to carry the same preemptive effect as federal statutes. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984).

■ The Supreme Court has delineated three ways in which federal law may preempt state law. First, Congress can expressly preempt state law by declaring its intent in express terms to preclude state regulation in a given area. Second, Congress can impliedly preempt state law by occupying an entire field of regulation leaving no room for state supplementation. Third, Congress can for all practical purposes preempt state law where compliance with both state and federal law is impossible or where state law stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress. *See Capitol Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 698–99, 104 S.Ct. 2694, 2699–2700, 81 L.Ed.2d 580 (1984); *Pacific Gas & Electric v. Energy Resources Commission,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). *See also* L. Tribe, *American Constitutional Law* § 6–26 at 481 n. 14 (1988).

Plaintiff maintains that Congress has vested in the ICC exclusive authority to regulate interstate rail transportation, including the means by which one rail carrier gains access to another carrier's tracks and facilities.

There are three types of arrangement by which a rail carrier may gain access to another carrier's tracks and facilities. First, the two carriers could agree to establish through routes by which an accessed carrier would carry the traffic over its own lines and thereafter transfer the traffic onto the accessing carrier at an interchange facility. If the participating rail carrier cannot agree upon the establishment of a particular through route or its terms, the ICC may provide the establishment of the through route as well as the terms for the arrangement where the ICC "considers it desirable in the public interest," 49 U.S.C. § 10705(a)(1) (1989), to establish such an arrangement.

Second, under certain circumstances, the ICC has the authority to require a rail carrier to allow another rail carrier physical access to its terminal area facilities, "including mainline tracks for a reasonable distance outside of a terminal ... if the Commission finds that use to be practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business." 49 U.S.C. § 11103(a). Included within its

authority to compel access is the authority of the ICC, in the absence of voluntary agreement between the participating carriers, to set the terms of the arrangement.

Third, an accessing carrier could obtain reciprocal switching service whereby the accessed carrier would operate the accessing carrier's railcars over its own tracks, finally reaching an interchange facility where the accessing carrier regains control over its railcars. In the absence of voluntary agreement, the ICC may require the establishment of such an arrangement as well as its terms where the ICC finds such arrangement "to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service." 49 U.S.C. § 11103(c)(1). *See generally Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1491–92 (D.C.Cir. 1988) (describing the three different ways carriers gain access to other carriers' tracks).

██ The relevant portions of the Interstate Commerce Act dealing with the authority of the ICC over trackage rights arrangements provide in pertinent part:

> The authority of the Interstate Commerce Commission under this subchapter is exclusive. A carrier or corporation participating in or resulting from a transaction approved by or exempted by the Commission under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority.

49 U.S.C. § 11341(a). Section 11343 deals explicitly with terminal trackage rights and provides in pertinent part:

> The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I (except a pipeline carrier), II, or III of chapter 105 of this title may be carried out only with the approval and authorization of the Commission:
>
> . . . .
>
> (6) acquisition by a rail carrier of trackage rights over, or joint ownership

in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

49 U.S.C. § 11343(a)(6). Regulation of carriers providing transportation between states, i.e., interstate rail transportation, falls within the jurisdiction of the ICC under 49 U.S.C. § 10501(a)(2)(A). Thus, to the extent that the access provisions and regulations apply to trackage rights affecting interstate commerce, they are explicitly preempted.

### A. Access—Interstate

Prior Supreme Court decisions confirm the exclusive nature of the authority vested in the ICC to regulate trackage rights affecting interstate commerce as preempting state regulation. In *Illinois Central Railroad Co. v. Fuentes*, 236 U.S. 157, 35 S.Ct. 275, 59 L.Ed. 517 (1915), the Supreme Court struck down a Louisiana regulation requiring a railroad to provide terminal switching services for interstate movements in Louisiana amongst any other railroad with which it connects, and to do so at rates approved by the state commission, as preempted under the Interstate Commerce Act. *Id.* at 161, 35 S.Ct. at 275. In *Transit Commission v. United States*, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1933), the ICC had approved a trackage agreement between two carriers and the Court found that state commission approval was unnecessary. In so holding, the Court found that the Transportation Act of 1920 stripped state regulatory bodies of power to prescribe terms for trackage rights. Finally, the Court concluded that "[t]he authority of the Interstate Commerce Commission is paramount and, in respect of [trackage rights transactions], it is necessarily exclusive." *Id.* at 129, 53 S.Ct. at 539. *Accord, Alabama & Vicksburg Ry. Co. v. Jackson & Eastern Ry. Co.*, 271 U.S. 244, 248–50, 46 S.Ct. 535, 536–37, 70 L.Ed. 928 (1926); *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 146–47, 66 S.Ct. 937, 945, 90 L.Ed. 1132 (1946). *See also Chicago v. Atchison, Topeka & Santa Fe Ry. Co.*, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958) (Chicago's attempt to regulate

inter-terminal transfer of interstate railroad passengers preempted by the Interstate Commerce Act).

Defendants attempt to argue that although the power of the ICC over interstate rail transportation is broad, it does not oust state authority to regulate in areas traditionally reserved to the states pursuant to their police powers. To illustrate their point, defendants rely upon the Supreme Court's decision in *Terminal Railroad Ass'n v. Brotherhood of Railroad Trainmen*, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), whereby the Supreme Court sustained an Illinois regulation requiring all railroads traveling through the state to be equipped with cabooses against preemption claims under the ICC. Crucial to the Court's decision, however, was the following reasoning:

> Appellant claims that there had been Congressional occupation of the field by virtue of the Boiler Inspection Act, the Safety Appliance Act, and the Interstate Commerce Act. It is not contended, nor do we understand, that these statutes, by themselves and unimplemented by any action of the Interstate Commerce Commission, lay down any requirement that cabooses shall or shall not be used on any of the runs in question. Nor is it contended that the Interstate Commerce Commission itself has sought to make any such requirement. At least in the absence of such action these Acts do not themselves preclude the state order, ... and it is unnecessary to consider on this occasion and without the participation of the Interstate Commerce Commission what may be the extent of its power under these Acts. If it should in the exercise of granted power determine whether appellant must provide cabooses, the State would be powerless to gainsay it.

*Id.* at 4, 63 S.Ct. at 422 (footnotes omitted; citations omitted). Unlike the regulation of cabooses, the ICC has developed specific regulations to implement the provisions of the Interstate Commerce Act dealing with trackage rights. *See Midtec Paper Corp. v. United States*, 857 F.2d 1487 (D.C.Cir. 1988) (court upheld proposed regulations of ICC requiring evidence of anticompetitive practices before ordering compulsory access under the Interstate Commerce Act).

The conclusion of the court to reject the state's attempts to regulate trackage rights affecting interstate commerce is bolstered by consideration of the effects of allowing each of the states the right to regulate interstate rail transportation passing through their borders. In *Wabash, St. Louis & Pacific Ry. Co. v. Illinois*, 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886), the case often credited with giving rise to the passage of the original Interstate Commerce Act of 1887, the Supreme Court refused to allow the State of Illinois to regulate the terms and conditions of railroad transportation originating in Illinois and terminating in another state, even where the regulation was limited to that portion of the movement occurring within Illinois. The Court reasoned that if every state through which a railroad passed were to adopt its own regulations of such transportation, "the deleterious influence upon the freedom of commerce among the States and upon the transit of goods through those States cannot be overestimated." *Id.* at 577, 7 S.Ct. at 13.

### B. Access—Intrastate

The more difficult question is the extent to which the 1980 amendment to the Interstate Commerce Act, known as the Staggers Rail Act, preempts state regulation of intrastate rail transportation, including regulation of trackage rights. Intrastate rail traffic has long been regulated by the federal government on the theory that such traffic is part of an interstate rail network and can sufficiently affect interstate commerce to permit regulation under the commerce clause of the Constitution. Because the federal commerce clause is plenary, Congress can invoke this power to preempt state regulation of intrastate rail traffic. Before 1980, the ICC was empowered by Congress to preempt state regulation only where the state was dilatory in acting upon a proposed intrastate rate change, or where an intrastate rate unjustly discriminated against or imposed an undue burden upon interstate commerce. With the passage of

the Staggers Rail Act in 1980, Congress expanded considerably the preemptive power of the ICC over intrastate rail traffic. *See generally Illinois Commerce Com'n v. I.C.C.*, 749 F.2d 875, 877 (D.C.Cir.1984), *cert. denied*, 474 U.S. 820, 106 S.Ct. 70, 88 L.Ed.2d 57 (1985).

Concerned with the financial plight of the railroad industry, particularly the overregulation and the dual regulation by government agencies, Congress passed the Staggers Rail Act, ushering in a new era of rail transportation policy.[10] To ensure uniformity in intrastate rail regulation, Congress devised a system, embodied in section 11501 of the Act, whereby states could continue to regulate upon condition that their standards and procedures had been submitted and approved by the ICC. 49 U.S.C. §§ 11501(b)(1) and (2).[11] States which failed to submit their standards and procedures to the ICC or whose standards and procedures were not approved by the ICC were stripped of all regulatory authority over intrastate rail transportation. 49 U.S.C. § 11501(b)(4)(B).[12] The pertinent jurisdictional sections of the Act reflect this dual system of regulation. 49 U.S.C.

---

10. The varying and often conflicting goals of the transportation policy are as follows:

In regulating the railroad industry, it is the policy of the United States Government—
(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;
(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;
(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;
(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;
(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;
(7) to reduce regulatory barriers to entry into and exit from the industry;
(8) to operate transportation facilities and equipment without detriment to the public health and safety;
(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;
(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;
(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;
(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;
(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;
(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and
(15) to encourage and promote energy conservation.
49 U.S.C. § 10101a.

11. Sections 11501(b)(1) and (2) provide:

(b)(1) A state authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.
(2) Within 120 days after the effective date of the Staggers Rail Act of 1980, each State authority exercising jurisdiction over intrastate rates, classifications, rules, and practices for intrastate transportation described in paragraph (1) of this subsection shall submit to the Commission the standards and procedures (including timing requirements) used by such State authority in exercising such jurisdiction.
49 U.S.C. §§ 11501(b)(1) and (2).

12. Section 11501(b)(4)(B) prescribes:

Any intrastate transportation provided by a rail carrier in a State which may not exercise jurisdiction over an intrastate rate, classification, rule, or practice of that carrier due to a denial of certification under this subsection shall be deemed to be transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.
49 U.S.C. § 11501(b)(4)(B).

§§ 11501(c) and (d).[13]

Defendants argue that section 11501 operates to preempt only state regulation of intrastate rail rates and rate-related matters. According to the defendants, all other aspects of state regulation of intrastate rail transportation are left intact. Relying on the legislative history, defendants contend that the Senate version of the Act which provided for complete preemption of state authority over intrastate rail transportation was rejected by the Conference Committee in favor of the House version which provided for preemption over only state regulation of intrastate rates, classifications, rules and practices. Defendants argue that this court should honor the compromise reached by the Conference Committee and refuse to read the Act as effecting a complete preemption of all aspects of intrastate rail transportation. A review of the legislative history indicates that the compromise which was ultimately reached by the Conference Committee relating to the preemption issue did not deal with preempting state authority over rate and rate-related matters as opposed to preemption over all aspects of intrastate rail transportation; but rather dealt with the role the states would retain as regulators upon passage of the Act. *See Utah Power & Light Co. v. I.C.C.,* 747 F.2d 721, 726 (D.C. Cir.1984), *rehearing denied,* 764 F.2d 865 (D.C.Cir.1985) (explaining that the original version of the Act would have left the states without any authority to regulate intrastate rates); *Illinois Commerce Com'n,* 749 F.2d at 888 (Scalia, J., dissenting) (same result).

Resolution of the preemption issue is complicated by Congress' seemingly interchangeable use of the terms "intrastate transportation" and "intrastate rates, classifications, rules, and practices" throughout the Staggers Rail Act. The confusion is exemplified by the following sections of the Act. Sections 11501(b)(1) and (2) provide:

(b)(1) A state authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.

(2) Within 120 days after the effective date of the Staggers Rail Act of 1980, each State authority exercising jurisdiction over intrastate rates, classifications, rules, and practices for intrastate transportation described in paragraph (1) of this subsection shall submit to the Commission the standards and procedures (including timing requirements) used by such State authority in exercising such jurisdiction.

49 U.S.C. §§ 11501(b)(1) and (2). However, sections 11501(c) and (d) state:

(c) This subtitle does not affect the power of a State, in exercising its police power, to require reasonable intrastate transportation by carriers providing transportation subject to the jurisdiction of the Commission under this subchapter unless (1) the transportation is deemed to be subject to the jurisdiction of the Commission pursuant to section 11501(b)(4)(B) of this title, or (2) the State requirement is inconsistent with an order of the Commission issued under this subtitle or is prohibited under this subtitle.

(d) The jurisdiction of the Commission and of State authorities (to the extent such authorities are authorized to administer the standards and procedures of this title pursuant to this section and section 11501(b) of this title) over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practices of such carriers, is exclusive.

49 U.S.C. §§ 11501(c) and (d).

---

**13.** Sections 11501(c) and (d) state:
  (c) This subtitle does not affect the power of a State, in exercising its police power, to require reasonable intrastate transportation by carriers providing transportation subject to the jurisdiction of the Commission under this subchapter unless (1) the transportation is deemed to be subject to the jurisdiction of the Commission pursuant to section 11501(b)(4)(B) of this title, or (2) the State requirement is inconsistent with an order of the Commission issued under this subtitle or is prohibited under this subtitle.

(d) The jurisdiction of the Commission and of State authorities (to the extent such authorities are authorized to administer the standards and procedures of this title pursuant to this section and section 11501(b) of this title) over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practices of such carriers, is exclusive.

49 U.S.C. §§ 11501(c) and (d).

General discussions of the preemptive effect of the Staggers Rail Act have produced conflicting interpretations by different panels within the Fifth Circuit as well as between different circuit courts. However, no court has directly confronted the issue now before the court. In *Illinois Commerce Com'n,* the District of Columbia Circuit Court held that ICC mandated exemptions from regulation are standards and procedures which certified states must adhere to in exercising their regulatory authority. In the course of its opinion, the court generally discussed the preemptive effect of the Staggers Rail Act and, relying upon section 11501(b)(1), opined that the Act effected a complete preemption of state regulation of intrastate transportation. *Illinois Commerce Com'n,* 749 F.2d at 878. Similarly, the Fifth Circuit in *State of Texas v. United States,* 730 F.2d 409 (5th Cir.1984), in finding a Texas rule mandating disclosure of actual rates inconsistent with federal standards and procedures, indicated its belief that under section 11501(b)(1) state authority to regulate in-

trastate transportation was preempted. *Id.* at 413.

However, in *Indianapolis Power and Light Co. v. I.C.C.,* 687 F.2d 1098 (7th Cir.1982), the Seventh Circuit, while refusing to allow the state to block ICC-approved rate increases, opined in its general discussion of the Act that the Act only preempted certain aspects of state regulation of intrastate transportation relating to rates and rate-related matters. *Id.* at 1100. Similarly, the Fifth Circuit in *State of Texas v. United States,* 730 F.2d 339 (5th Cir.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984), in upholding constitutional challenges to the Staggers Rail Act stated, in dicta, that the Act preempts only state regulation of rates and rate-related matters. *Id.* at 346–47.

The ICC has not addressed this issue either.[14] In considering the ability of states which are not certified to regulate aspects other than rate and rate-related matters of intrastate transportation, the ICC, relying upon sections 11501(b)(1) and 11501(b)(4)(B), has concluded that such states no longer have any regulatory authority over intrastate transportation.[15]

West Virginia having received certification from the ICC, *see* Ex Parte No. 388 (Sub–No. 2), *et al., State Intrastate Rail Rate Authority—Arkansas, et al.* (not published) (served Feb. 22, 1984), the issue whether West Virginia may regulate aspects of intrastate transportation other than rates and rate-related matters re-

**14.** The ICC in its amicus brief has asked the court to refer the issue to it pursuant to 28 U.S.C. § 1336(b) (1986). Implicit in the ICC's request is an acknowledgement that the issue is still unresolved. It appears to the court at this stage of the case that the issue is simply one of statutory construction and application in light of the access regulations adopted by the PSC and their status as to ICC certification and recertification. *See* note 17, *infra.* Consequently, it would not now seem helpful to refer this issue to the ICC. *See Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977).

**15.** In Finance Docket No. 30820, *Mendocino Coast Railway, Inc.—Discontinuance of Train Service in Mendocino County, CA* (served Nov 28, 1986), *petition to vacate as moot denied,* —— I.C.C.2d —— (1987), the California Public Utilities Commission argued, like the defendants,

that because § 11501 of the Act preempts only state regulation of intrastate rates and rate-related matters, the state commission had jurisdiction over the proposed discontinuance of passenger service on a purely intrastate line. In rejecting the state commission's argument, the ICC reasoned:

> We reject CAPUC's arguments. First, the law clearly provides that a State may regulate *intrastate transportation* only if it follows Federal standards and procedures (section 11501(B)(1)). Certification is the only means by which States can so regulate *intrastate transportation;* California did not ask to be certified. Accordingly, regulation of California rail transportation matters was preempted by this Commission.

(Footnotes omitted; emphasis in original).

mains open. In this connection, ICC approval is required for any change in the state standards. 49 U.S.C. § 11501(b)(5)(B).[16] More importantly, certified states must regulate in a manner consistent with the requirements of the Interstate Commerce Act. 49 U.S.C. § 10501(c).

Before the court reaches the issue of the preemptive scope of the Staggers Rail Act, a question exists as to whether the access regulations constitute rate-making. As indicated earlier, under W.Va.Code §§ 24-3-3b(b) and (c), the PSC is charged with the authority of setting the rates to be charged for access. Plainly, the means for calculating such rates must be consistent with federal standards and procedure.

Accordingly, in order to determine whether the West Virginia access regulations and the underlying statutory provisions constitute impermissible intrastate rate-making or otherwise invade preempted territory, a hearing shall be conducted.[17]

### C. Abandonment

Section 24-3-3b(g) of the West Virginia Code purports to require all carriers to obtain permission from the Public Service Commission prior to abandoning or discontinuing service over their tracks. The relevant portion of the Interstate Commerce Act dealing with abandonments or discontinuances provides:

> A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may—
>
> (1) abandon any part of its railroad lines; or
>
> (2) discontinue the operation of all rail transportation over any part of its railroad lines;
>
> only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

49 U.S.C. § 10903(a). In interpreting this section, the Supreme Court recently stated in *Chicago & N.W. Tr. Co. v. Kalo Brick &*

16. Section 11501(b)(5)(B) provides that: "During any 5-year certification period, a State may not change its certified standards and procedures without notifying and receiving express approval from the Commission." 49 U.S.C. § 11501(b)(5)(B).

17. At such hearing, the court will consider the information supplied by the state to the ICC in its application for recertification as of March 25, 1989, and the impact the state's access regulations will have upon intrastate rates, rules, classifications and practices.

With respect to recertification, *see State Intrastate Rail Rate Authority–Recertification Process,* Ex Parte No. 388A (Feb. 8, 1989), wherein the ICC determined that for purposes of being recertified, states would need to certify that the previous standards and procedures which they had initially submitted remained in effect. More importantly, states would need to:
[C]ertify that they remain the same, except to the extent they have been updated to reflect changes in Federal standards. They will also be required to submit a list of updates they have made, and that list must be all-inclusive of relevant changes this agency has made to related interstate standards and procedures. [A State authority can only exercise jurisdiction in this area if it exercises such jurisdiction exclusively in accordance with Federal

law. 49 U.S.C. 11501(b)(1)]. States must certify that they have adopted these changes and incorporated them into their standards and procedures. Finally, they must certify that their intrastate authority will be exercised in accordance with Federal law, and that Federal law will govern even if not explicitly so provided in their rules.
*Id.* (footnote omitted). In an appendix to its decision, the ICC listed several areas in which changes had been made. Specifically, the ICC pointed the states' attention to changes in trackage rights. In this regard, the appendix provided:
G. Joint Rates
1. For procedures for requesting rail variable costs and revenue determinations for joint rates subject to surcharge or cancellation, see Proc. for Rail Variable Cost and Revenue Determinations, 3 I.C.C.2d 703 (1987) and 49 CFR 1138.
2. For procedures relating to the cancellations of joint rates and complaints seeking the prescription of joint rates and reciprocal switching arrangements, see Intramodal Rail Competition, 1 I.C.C.2d 822 (1985) and 49 CFR 1144.
West Virginia's original certification expired as of March 25, 1989. The ICC, by order of March 24, 1989, provisionally recertified West Virginia, pending final action on West Virginia's recertification request.

*Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981):

> This section, we have said, must be "construed to make federal authority effective to the full extent that it has been exerted and with a view of eliminating the evils that Congress intended to abate." *Transit Comm'n v. United States, supra,* [289 U.S. 121] at 128 [53 S.Ct. 536, at 538]. Among those evils is "[m]ultiple control in respect of matters affecting [interstate railroad] transportation," because such control, in the judgment of Congress, has proved "detrimental to the public interest." 289 U.S., at 127 [53 S.Ct., at 538]. See *Chicago v. Atchison, T. & S.F.R. Co., supra,* [357 U.S. 77] at 87 [78 S.Ct. 1063, at 1069]. Consequently, we have in the past concluded that the authority of the Commission to regulate abandonments is exclusive. *Alabama Public Service Comm'n v. Southern R. Co.,* 341 U.S. 341, 346, n. 7 [71 S.Ct. 762, 766, n. 7, 95 L.Ed. 1002] (1951). See *Colorado v. United States,* 271 U.S. 153, 164–166 [46 S.Ct. 452, 454–55, 70 L.Ed. 878] (1926). The Commission's authority over abandonments is also plenary. So broad is this power that it extends even to approval of abandonment of purely local lines operated by regulated carriers when, in the Commission's judgment, "the over-riding interests of interstate commerce requir[e] it." *Palmer v. Massachusetts,* 308 U.S. 79, 85, 60 S.Ct. 34, 37, 84 L.Ed. 93 (1939).

*Id.* 450 U.S. at 320, 101 S.Ct. at 1131. *See also Louisiana & Arkansas Railway Co. v. Bickham,* 602 F.Supp. 383 (M.D.La.) *affirmed without opinion,* 775 F.2d 300 (5th Cir.1985) (abandonment provision of Interstate Commerce Act preempted railroad's action to enjoin property owner from removing its tracks from the property owner's land which railroad had obtained rights to use under state property law).

Defendants argue that the constitutional challenge to § 24–3–3b(g) is not ripe for review until the state's courts have interpreted that section. However, as plaintiff points out, because the challenge to § 24–3–3b(g) is a facial one, the issue is properly framed to permit of court resolution. In *Shell Oil Co. v. City of Santa Monica,* 830 F.2d 1052 (9th Cir.1987), *cert. denied,* 487 U.S. 1235, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988), the Ninth Circuit stated:

> The preemption issue posed by Shell is ripe for review because the disagreement over whether Santa Monica may impose any safety standards is clearly framed by the facts of this case. The city has unambiguously indicated its resolve to require at least some safety standards in the new franchise agreement. This issue has a concrete impact on the parties because the safety standards represent a major obstacle to the execution of a new agreement. The issue is not unripe because a mere possibility exists that a final agreement might not contain any safety standards or that no franchise would be granted at all. *See National Basketball Ass'n v. SDC Basketball Club, Inc.,* 815 F.2d 562, 565–66 & n. 2 (9th Cir.1987). We conclude that the question whether Santa Monica may impose any safety standards in the new franchise agreement is ripe. *See California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (no ripeness problem noted in suit seeking declaration that federal law preempted a state agency from imposing *any* environmental standards in a mining permit, even though plaintiff had not secured a permit).

*Id.* at 1062 (footnote omitted; emphasis in original). Similarly, the question whether West Virginia law can impose any obligations upon carriers with respect to abandonments and discontinuances is ripe for review. In this regard, the court finds, under the reasoning of the Supreme Court's decision in *Kalo Brick* that West Virginia may not require rail carriers to obtain prior approval from the PSC before abandoning or discontinuing service on their lines. Accordingly, § 24–3–3b(g) violates the supremacy clause as being preempted by § 10903(a) of the Interstate Commerce Act.

In light of the above, it is ORDERED that plaintiff's motion for partial summary

judgment based on the supremacy clause challenge to the access statutory provisions and regulations providing for trackage rights in interstate transportation contained in count I and the abandonment provisions contained in count III be, and the same hereby is, granted.

It is further ORDERED that plaintiff's motion for partial summary judgment based on the supremacy clause challenge to the access statutory provisions and regulations providing for trackage rights in intrastate transportation contained in count I be, and the same hereby is, deferred pending hearing of the statutory construction issue.[18]

Correspondingly, it is further ORDERED that defendants' motion for partial summary judgment and to dismiss the supremacy clause challenge to the access statutory provisions and regulations providing for trackage rights in interstate transportation contained in count I and the motion to dismiss the abandonment challenge contained in count III be, and the same hereby are, denied.

And it is further ORDERED that intervening defendant West Virginia Coal Association's motion for judgment on the pleadings as to count I and motion for partial summary judgment as to count I based on the supremacy clause challenge to the access statutory provisions and regulations providing for trackage rights in interstate transportation contained in count I be, and the same hereby is, denied.

The remainder of the motions not fully dealt with are deferred pending ruling on the statutory construction issue.[19]

### FINAL ORDER AND JUDGMENT

WHEREAS, the Court, by memorandum orders dated July 14, 1989 and December 19, 1989: (a) granted the motion of Plaintiff Association of American Railroads for summary judgment with respect to Counts I and III of its First Amended Complaint against Defendants the Public Service Commission of West Virginia ("PSC"), Michael D. Greer, Chairman of the PSC, Otis D. Cast, Commissioner of the PSC, and Charlotte R. Lane, Commissioner of the PSC; (b) denied the motion of Defendants PSC and the individually named members thereof for summary judgment with respect to Count I of the First Amended Complaint and for dismissal of Count III of the First Amended Complaint; and (c) denied the motion of Intervening Defendant West Virginia Coal Association for summary judgment and for judgment on the pleadings with respect to Count I of the First Amended Complaint; and

WHEREAS, the Court's memorandum orders dated July 14, 1989 and December 19, 1989 are incorporated by reference herein; and

IT IS ORDERED THAT:

1. The open access provisions of West Virginia Senate Bill 278 (codified at Sections 24-1-1(a)(6) and 24-3-3b of the Code of West Virginia) ("Senate Bill 278") and the PSC's regulations implementing the open access provisions of Senate Bill 278 (codified at 150 C.S.R. 18 and 150 C.S.R. 19, as adopted by the PSC in a decision released October 14, 1987 in General Order Nos. 237 and 238 ("PSC Regulations") are hereby declared unlawful, invalid and of no legal force or effect because they violate the Interstate Commerce Act (49 U.S.C. §§ 10101 *et seq.*) and the Supremacy Clause (art. VI, cl. 2) of the United States Constitution.

2. The abandonment provisions of Senate Bill 278 (codified at Section 24-3-3b(g) of the West Virginia Code) are hereby declared unlawful, invalid and of no legal force or effect because they violate the Interstate Commerce Act (49 U.S.C. §§ 10101 *et seq.*) and the Supremacy Clause

---

**18.** Upon ruling on the statutory construction issue, the court will consider, if necessary, the commerce clause challenge asserted by the plaintiff in count II.

**19.** Upon ruling on the statutory construction issue, the court will consider, if necessary, the commerce clause, takings clause, ripeness, and abstention arguments advanced in the motions by the defendants to the extent not dealt with herein.

(art. VI, cl. 2) of the United States Constitution.

3. Defendants, their agents, employees, representatives and all other persons acting under their authority, are permanently enjoined from enforcing or otherwise applying (a) the open access provisions of Senate Bill 278, (b) the PSC Regulations and (c) the abandonment provisions of Senate Bill 278.